**FILED**

MAR 1 3 2023

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

_____
DEPUTY CLERK

| | |
|---|---|
| SHARIDAN L. STILES,<br>Inventor,<br>*Individual, Pro Se",*<br>*Plaintiff,*<br>v.<br>THE PROCTER & GAMBLE COMPANY, a<br>corporation.<br>*Defendant.* | Civil Action No.<br><br>JURY TRIAL DEMANDED<br><br>2:23 - CV 0 4 7 4 - TLN DMC PS |

*Plaintiff Pro Se"*
*Sharidan L. Stiles, Inventor,*
*Alleges as follows:*

1. INTENTIONALTORT (C.C. § 425.12) Exemplary Damages (C.C. § 3294 (c)(1), (c)(2), (c)(3)), (Malice, Fraud, Oppression) (15 U.S.C. § 6611) Ongoing.

2. PRICE FIXING (15 U.S.C. § 3502) (Scheme) includes PRICE SHARING and BID RIGGING. (Certification), for Class Action. Ongoing

3. DIVESTITURE (18 U.S.C. § 208), (15. U.S.C. § 1); ("Petition of Procter and Gamble" of proposed divestiture of the Gillette Company's shaving) sent to the FTC to divest 25%-40%. Ongoing.

4. PATENT INFRINGEMENT (35 USC 271, 281, 283-285, 289), 28 U.S.C. §§ 1331 and 1338(a); Patent # 9,707,689. Ongoing.

5. INJUNCTION (15 U.S.C. § 1116) Patent # 9,707,689 infringement products. (Battery operated, disposable and non-disposable shaving and or trimming devices). Ongoing.

RAZOR QUEEN V KING OF RAZORS

## JURISDICTION AND VENUE

1. This action arises under the antitrust laws Title 15 of the United States Code, the patent laws of the Title 35 of the United States Code. This Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

2. Claims 1, 2, 3, 4, 5 are currently ongoing and intentionally causing direct harm to the Citizens of United States of America and SHARIDAN L. STILES, INVENTOR.

3. Plaintiff, SHARIDAN L. STILES (hereafter ("INVENTOR"), is an American inventor and entrepreneur, and the creator of the patented Stiles Razor product line. INVENTOR conducted business across the USA.

4. Defendant, PROCTOR & GAMBLE (hereafter ("P & G"), our country's largest supplier for almost every retail market, from Walmart to 7-11 to Chevron; Defendant conducted these Violations throughout the USA and does not posses a hardship.

5. Plaintiff has suffered harm throughout the United States from ("P & G").

## THE PARTIES

1. Plaintiff: SHARIDAN L. STILES, Inventor of Detailed Shaving Razors resides at 2570 Harlan Drive, Redding, California 96003-3479.

2. Defendant:  The Procter & Gamble Company a corporation organized, existing and doing business under the laws of Ohio with its office and principal place of business located at One Procter & Gamble Plaza, Cincinnati, Ohio, 45202.

## INTRODUCTION

Claims 2, 3, 4, 5 each Intentionally Caused Oppression of Claim 1

1. It has been a QUARTER of a CENTURY that INVENTOR has worked with the USPTO and is before this Court since 2014.

2. Over two dozen high profiled and expensive attorneys have worked on "Contingency" for INVENTOR, because it is an extremely "Valuable and Valid".

3. Everyone has ideas and the citizens of the United State of America, should know either:

   a. Inventors can pursue their idea with the USPTO and a patent is validation, OR,
   b. Inventors should know that their investment in Attorneys and the USPTO is at jeopardy.

4. An example is P & G purchased companies with one single razor, not new innovation in shaving in tune of $3 Billion each.

5. Discovery confirmed repeatedly that, P & G is the head of the Cartel in Wet Shave, Personal Care and Beauty departments.

6. GILLETTE was purchase for $57 Billion by P & G after INVENTORS inventions for Men's grooming was being solicited in 1998 and produced starting in the year 2000, the "Noxzema Eyebrow Razor" and the "Bikini Razor". The Bikini Razors width was changed and their Eyebrow razor was removed and sold as a Kai brand. This acknowledges infringement.

7. P & G owns over 70% of the shaving market, which requires by law with the SEC, FTC, under the DOJ a divestiture to be implemented, so as not to be a monopoly anymore, not to pay fines and keep their position. Since INVENTOR was directly harmed from P & G; INVENTOR has the privilege and responsibility to participate in the "Demand this Divestiture".

8. P & G are still threatened by INVENTOR's new innovation of the detailed shaving razor line for both Men and Women, or INVENTOR would not be in this position of having to defend her right to patent protection among other violations. INVENTOR had patents pending and has patents of the small razor blade sizes for many shaving applications under 1" inch width. One may look back in history and know factually that GILLETTE prior to 1998 never had patents pending or patented a razor blade less than 1" inch width blade nor ever sold one. There it is! Simplicity! Factual!

9. Evidence reveals that from the year 2000 STILES inventions were being sold as the Noxzema "Bikini razor, eyebrow razor) then design of Mach 3, Venus Razor, and names of devices that INVENTOR, invented like "Eyebrow" "BODY" shaving, "SNAP" on and off blades, "BIKINI", "SCALP ART", "DETAILED SHAVING" & "INTERCHANGEBLE HEADS AND WITH DIFFERENT BLADE WIDTHS". All new "slogans for future trademarks" of new invention from INVENTOR business plan in 1999, down to changing her advertising song tune to "Venus" in the commercial. INVENTOR made the first "curvy shape razor handle" at that time in1998 all razors were" stick" like shape. Venus also made their first curvy handle the same "color" as INVENTOR, which was clear.

10. One may Google or search Amazon for "Stiles Razor" and you will see dozens of infringers whom are owned by a few corporations under P & G control, P & G the head of their Cartel, which consist of the "Category Management", "Category Advisors"; but you won't see the real "Stiles Razor" in the search. They are still using INVENTORS name "Stiles Razor" in their search terms to sell their knockoffs.

11. P & G and their cronies, "the Cartel" are continuing to conspire in the elimination of INVENTOR as a person deliberately in all aspects of her life, her property, liberty, justice, financially, Intellectual Property, Computer, Surveillance and at the same time deprived the American People "CHOICE" of products, cost, availability, "supply chain issues" and quality, such as environmentally-friendly manufacturing with less waste, not made from slavery in China, where consumer has to throw it away and buy a new one, also their waste in batteries, plastic & packaging.

12. The Price Fixing Scheme and the Divestiture of the Gillette Company from P & G. Both are automatic Antitrust Violations. Both are also in INVENTOR supporting documents for this particular Claim of Tortious Acts, (Intentional Harm} toward INVENTOR.

13. Plaintiff INVENTOR is an American entrepreneur, inventor, and small businesswoman. For more than two decades, INVENTOR has devoted most of her waking hours—and substantially all of her financial resources—to designing, developing, and perfecting a line of high-quality, American-made beauty accessories under the INVENTOR' brand with her and her family's earnings.

14. In conclusion, we have the head of the Cartel P & G; now knowing P & G is totally responsible for

International Harm the Claim #1 from the beginning, causing destruction of INVENTORS life, patents that started in 1998; to copy them to manipulate the prices and placement, to retailers, to ensure that so P & G controls the relevant market, preventing this new innovation of detailed shaving, which surpasses what King Gillette invented, the "disposable blade", who worked in a bottle factory and the machine stamped the caps for the bottles, King Gillette invented a stamped razor blade for shaving and it took the market, now over 70% of a monopoly; on the other hand INVENTORS invention is not one blade it is much more, "my SUPPORTERS call me the Razor Queen", which I take as a huge compliment and gives me strength.

15. P & G spends millions a year on Patent's and is aware of all competitor applications made at the USPTO.  P & G has every resource available to destroy anyone whom get's in their way to maintain "CONTROL" of our market, it is their narrative.

16. If it happened to INVENTOR it is happening to thousand of inventors every day!

## #1 Intentional Tort:

1. INVENTOR has suffered irreparable harm for a quarter of a Century of her life and it is continuing as of today, INVENTOR should be respected by providing Justice; she is a victim of crimes.  P&G has and had the means to prevent INVENTORS suffering since 1998.  Just the fact of Plaintiff being forced to spend her life since 2014, to go to court to prove she was violated, had earned and obtained patents issued from the USPTO it is inconceivable, as INVENTOR having to go to civil court to enforce the patent law from what P & G has done to INVENTOR.  I believe it is their intention for me to die before this is resolved, so it wont be resolved!  P&G maliciously chose to continue with their INSIDIOUS BEHAVIOR, toward INVENTOR and the AMERICAN PEOPLE, the consumers and the Investors.

2. Surveillance of her home is still taking place and computer tampering evidence available as well. Example INVENTOR possesses videos of persons on her computer searching manufacturers and Chinese manufacturers, etc.

3. INVENTOR has suffered physical pain from stress, emotional pain and anguish, loss of companionship, loss of society, inconvenience, loss of enjoyment of life, injury to reputation and no privacy what so ever, above all loss of time, 1/3 of life.

## Price Fixing, Price Sharing & Bid Rigging:

1. Following lines 2-7 is evidence and validation for a "Certification" of a "Class Action" to provide INVENTOR.

2. **(EXHIBIT A)** (Redacted as courtesy) a draft to Deborah Platt Majorca's lead Counsel of Antitrust Division of P & G proving both Price fixing and Divestiture Claims, for negotiations.

3. **(EXHIBIT B)** a previous motion that is the foundation of a "Class Action" Claim of Price fixing from INVENTORS discovery, which are the facts, exposing the Cartel of this Claim.

4. **(EXHIBIT C)** The FTC, SEC under the DOJ worked from INVENTORS evidence.

5. **(EXHIBIT D, D-1, D-2, D-3, D-4, D-5.)** are screenshots of how this process works in Category Advisory through out the UNITED STATES of AMERICA.

5

    a. **(EXHIBIT D)** INVENTORS items sold on amazon.com and target.com; When she contacted "seller central" Amazon sent her an email stating that she was not the Creator of her items and someone else was, attached in the email is a screen shot of whom was the Creator of INVENTORS account.

    b. **(EXHIBIT D-1)** Screen shot states Target was the creator of INVENTORS account.

    c. **(EXHIBIT D-2)** An email from INVENTORS buyer at Target, "Kristen Lintz".

    d. **(EXHIBIT D-3)** INVENTORS Buyer "Kristen Lintz" is employed by P & G not Target; she is a behavioral analyst.

    e. **(EXHIBIT D-4)** My weekly Account Balance from Target.com was **$64,593,372.58**

    f. **(EXHIBIT D-5)** I contacted "POL" "Partners on Line" as directed to do and explained this large payment to be placed in my bank via EFT; Molly said INVENTORS was a Procter and Gamble item.

6.   "Class Action" may entail the following:

    a. **Securities class actions:** Investors who are damaged by improper conduct on the part of companies or board members can come together to sue.

    b. **Consumer class actions:** Consumers can bring claims for false advertising, defective products, antitrust violations or consumer fraud.

    c. **Inventors in the United States of America.**

7. INVENTOR is the lead Plaintiff and or Witness for all Civil Actions regarding in this Claim and this evidence is property of INVENTORS, C. I. "Commercial Intelligence", "Work Product" of a quarter of a Century.


### Divestiture:

1. **(EXHIBIT A)** Refer to again a draft to P & G proving Divestiture.

2. **(EXHIBIT E)** Commissioner: Chairman Deborah Platt Majoras's, Complaint FTC OF THE PROCTER & GAMBLE and GILLETTE. (Acquisition of Gillette).

3. **(EXHIBIT F)** Commissioner: Chairman Deborah Platt Majoras, Petition FTC OF THE PROCTER & GAMBLE FOR APPROVAL OF PROPOSED DIVESTITURE. Regarding similar situation to INVENTOR.

4. INVENTOR is requesting that this Court certify this Claim for INVENTOR and for the UNTIED STATES OF AMERICA.. so she may initiate the "Class Action".

5. P & G owns over 70% of the market in shaving products and accessories. They did not want to share their shelf space to any competitor that they don't control. Together hey are moving parts. With this divestiture, INVENTOR and new INNOVATORS will be treated fairly with opportunity to succeed in competition to obtain shelf space in all retail outlets.

6. Certificate from this Court, is INVENTORS choice, the victim of this Violation.

7. Sale of property to comply with conflict-of-interest requirements: Certificate of divestiture; The term "certificate of divestiture" means any written determination (A) that states that divestiture of specific property is reasonably necessary to comply with any Federal conflict of interest statute, regulation, rule, judicial canon, or executive order (including section 208 of title 18, United States Code), or requested by a congressional committee as a condition of confirmation, (B) that has been issued by the President or the Director of the Office of Government Ethics, in the case of executive branch officers or employees, or by the Judicial Conference of the United States (or its designee), in the case of judicial officers, and (C) that identifies the specific property to be divested."

8. INVENTOR presently is directly being harmed by P & G has the right to implement this divestiture and be part of the process as a civil matter. INVENTOR chose this Court firstly.

9. The antitrust laws prohibit conduct by a single firm that unreasonably restrains competition by creating or maintaining monopoly power. Most Section 2 claims involve the conduct of a firm with a leading market position, although Section 2 of the Sherman Act also bans attempts to monopolize and conspiracies to monopolize. As a first step, courts ask if the firm has "monopoly power" in any market. This requires in-depth study of the products sold by the leading firm, and any alternative products consumers may turn to if the firm attempted to raise prices. Then courts ask if that leading position was gained or maintained through improper conduct—that is, something other than merely having a better product, superior management or historic accident. Here courts evaluate the anticompetitive effects of the conduct and its procompetitive justifications.

10. Market Power: Courts do not require a literal monopoly before applying rules for single firm conduct; that term is used as shorthand for a firm with significant and durable market power — that is, the long-term ability to raise price or exclude competitors. That is how that term is used here: a "monopolist" is a firm with significant and durable market power. Courts look at the firm's market share, but typically do not find monopoly power if the firm (or a group of firms acting in concert) has less than 50 percent of the sales of a particular product or service within a certain geographic area. Some courts have required much higher percentages. In addition, that leading position must be sustainable over time: if competitive forces or the entry of new firms could discipline the conduct of the leading firm, courts are unlikely to find that the firm has lasting market power.

11. Exclusionary Conduct: Judging the conduct of an alleged monopolist requires an in-depth analysis of the market and the means used to achieve or maintain the monopoly. Obtaining a monopoly by superior products, innovation, or business acumen is legal; however, the same result achieved by exclusionary or predatory acts may raise antitrust concerns.

12. Exclusionary or predatory acts may include such things as exclusive supply or purchase agreements; tying; predatory pricing; or refusal to deal. These topics are discussed in separate Fact Sheets for Single Firm Conduct.

## Patent Infringement:

1. INVENTOR and assignee of U.S. Patent No. Patent # 9,707,689.

2. **(Exhibit G)** a true and correct copy attached..

3. (This patent is valid and enforceable); it will be legally defined as so.

4. The '329 patent was filed July 10, 2007, and claims priority to (among others) U.S. Patent Application No. 09/725,789, filed November 29, 2000, and U.S. Patent Provisional Application No. 60/830,952, filed November 1, 2000.

5. The '329 patent discloses and claims inventions that Stiles first conceived of in 1998, and that STILES diligently reduced to practice without abandoning, suppressing, or concealing them.

6. The '329 patent issued August 18, 2015, after years of delay by the USPTO. Based on the USPTO's delay, the '329 patent is entitled to a lengthy patent term extension ("PTE").

7. At the '329 patent's issuance, the USPTO calculated a PTE of 740 days, such that the '329 patent expires no earlier than December 9, 2022. However, on information and belief, the '329 patent is entitled to a longer PTE than 740 days, based on the nearly fifteen-year delay between Stiles' originally-filed application and the issuance of the '329 patent.

8. INVENTOR is assignee of the '329 patent, and has all right, title, and interest in the '329 patent.

## Injunction:

1. INVENTOR requests that this Court enforces Claim 5.

2. Of all infringing products that P&G Influenced and or controlled.

3. Patent # 9,707,689 infringement products. (Battery operated, disposable and non-disposable shaving and or trimming devices).

4. To protect the rights of INVENTORS Intellectual Property that took from 1998 to present protecting it. ONE QUARTER of a CENTURY.

5. Reassurance to American People, that they can file with the USPTO and pay Attorney's for the right to a patent to obtain a LEGAL MONOPOLY OF 20 YEARS, this is what they need to receive.

## Additional Exhibits:

1. **(EXHIBIT H)** Letter to Ms. Kathleen Foote DOJ in 2015 referenced back to 2014, requesting INVENTORS "Whistleblowing" on Walmart and DOES.

2. **(EXHIBIT I)** Writ of price fixing in banking industry, INVENTORS evidence.

3. **(EXHIBIT J)** Requesting to work with KAI to manufacture "Stiles Razors" Eyebrow and Bikini Razor. Kai is the manufacturer for the Noxzema Eyebrow and Bikini Razors. under P & G.

4. **(EXHIBIT K)** Update to Kai regarding our conversations.

5. **(EXHIBIT L)** Category Advisors under P & G are astonished, despite all of their attempts to sabotage INVENTORS sales at Walmart INVENTOR was still outperforming all other items by 17%.

6. **(EXHIBIT M)** P & G directing Category Advisors and Buyer at Walmart regarding the "Stiles Razor".

7. **(EXHIBIT N)** Invoice charged to INVENTOR using her Expert Witnesses to review the FTC's Claims for Price Fixing. Etc.. INVENTORS Attorney's used her Expert Witnesses without permission and kept this from INVENTOR regarding Price Fixing etc. At the same time they were all leaving the firm without her knowledge, the other firm resigned. They left the INVENTOR remaining helpless and more destitute prior to them requesting her case.

8. **(EXHIBIT O)** Manufacturer in China part of this Cartel having the "Stiles Razor" disposable Eyebrow Razor in their packaging to have them "knock off" this item.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sharidan L. Stiles respectfully requests that this Court enter:

1. A Judgment that PROCTER AND GAMBLE has intentionally inflicted INVENTOR SHARIDAN STILES with (**OPPRESSION**). 1st Claim

2. A Certification in favor of I INVENTOR SHARIDAN STILES so she will use for the UNITED STATES OF AMERICA, (the Inventors, consumers and Investors) that PROCTER AND GAMBLE committed Violations of Price Fixing etc. for a Class Action Claim, 2nd Claim.

3. A determination in favor of INVENTOR SHARIDAN STILES so she will use for the UNITED STATES OF AMERICA, (the Inventors, consumers and Investors) that P & G committed Violations for divestiture of PROCTER AND GAMBLE, 3rd Claim

4. A judgment in favor of INVENTOR, SHARIDAN L. STILES that PROCTER AND GAMBLE has infringed literally, patent # 9,707,689. 4th Claim. So she will show the UNITED STATES OF AMERICA.

   a. Will provide the proper law to the Court on this patent. (All blade widths up to ½").

   b. An award of damages resulting from PROCTER AND GAMBLE acts of infringement in accordance with 35 U.S.C. § 284, including an enhancement for P & G willful infringement.

5. An immediate judgment and order requiring PROCTER AND GAMBLE to stop all sales of infringing products of INVENTOR. 5th Claim

6. A judgment and order requiring PROCTER AND GAMBLE to provide accountings and to pay supplemental damages to INVENTOR, including, without limitation, prejudgment and post-judgment interest; and any and all other relief to which INVENTOR may show herself to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, INVENTOR requests a trial by jury of any issues by right.

Plaintiffs demand a trial by jury as her right under the Seventh Amendment to the Constitution of the United States or as given by statute.  Fed. R. Civ. P. 38.

Respectfully submitted,

Dated: March 11, 2023

By:      */s/ Sharidan L. Stiles*

*Plaintiff: Sharidan L. Stiles*

## CERTFICATE OF SERVICE

I, Sharidan L. Stiles, declare as follows.  I am over the age of 18 years.  My address is 2570 Harlan Drive; Redding, California 96003-3479

On March 12, 2023, I filed to:

The Procter & Gamble Company a corporation,
One Procter & Gamble Plaza, Cincinnati, Ohio, 45202.

I filed this Complaint in person with the,
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA,

Described as:

Sharidan L. Stiles v Proctor and Gamble

**[X] CERTIFIED MAIL:**  Above address

**[X] ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail provided when filed..

I declare under penalty of perjury under the laws of the United States of America that the information

in this proof of service is true and correct.
Executed on March 12, 2023, at Redding, California 96003-3479

.

Sharidan L. Stiles

# Exhibit A

July 20, 2021

Deborah P. Majores
Chief Legal Officer & Secretary
The Proctor & Gamble Company

Dear Ms. Majores,

As you may recall, I represent Sharidan Stiles and Stiles 4 U, Inc. in a lawsuit against Wal-Mart Stores, Inc. ("Walmart") and American International Industries ("AI") for violating antitrust, patent and unfair competition laws, among others (Case No. 2:14-cv-2234). Documents produced in discovery revealed extraordinary circumstances of an illegal conspiracy, in which Proctor & Gamble ("P&G") knowingly and actively participated.

Stiles is an American entrepreneur, inventor, and small businesswoman. For more than two decades, she has devoted most of her waking hours – and substantially all of her financial resources – to designing, developing, and perfecting a line of high-quality, American-made beauty accessories under the Stiles brand. The signature product of the Stiles line is the disposable personal styling razor with a narrow 1/8-inch blade and ergonomic handle designed for detailed shaving of unique areas of the body like eyebrows, scalp art, and sideburns (the "Stiles Razor").

In 2003, Walmart selected Stiles as a supplier of its personal disposable razor in the Wet Shave category. The Stiles Razor was introduced in 2006 among 500 Walmart stores as an initial market. In 2007, her product was expanded into over 2,000 Walmart stores, and in 2008, the Stiles Razor was sold in over 3,000 Walmart stores, which constituted almost $2 million in annual sales. At the time, Walmart comprised 100% of the Stiles' razor business, and its success was undeniable.

However, in 2009, Walmart abruptly removed the Stiles Razor from nearly 58% of its stores and eliminated it entirely from its Wet Shave category in 2010. Her product was briefly added to the Beauty category in 2011, but Walmart informed Stiles in 2012 that it would no longer carry it and stopped all sales of the Stiles Razor in 2013.

Evidence in the case revealed that P&G was a powerful force behind Walmart's decisions.

- In 2008, Walmart selected P&G to serve as the Category Advisor[1] for its Wet Shave category, which included the Stiles Razor, and relied on P&G to provide it with the

---

[1] As Walmart's Category Advisor, P&G was responsible for recommending for each product: retail pricing, Walmart stores approved to carry each product, promotional displays, shelf assignments, product deletions, and sales projections. P&G owned the responsibility of recommending to Walmart's Buyer the management of P&G's own products and its competing products. P&G incurred substantial costs in purchasing data, constructing recommendations based upon its own analyses of Walmart records and market data, and reporting in person multiple times a week to Walmart's Buyer. Walmart owned the responsibility of compensating P&G for these costs. One method of compensating P&G was through accepting P&G's recommendations that did not negatively affect P&G's profits. (House report, p. 7-9).

research and recommendations on retail prices, projected prices, shelving space allocations, store counts, store selections, and additions/exclusions of suppliers and supplier products in Walmart stores.[2]

- In December 2008, P&G provided Walmart with the modular specification for the Wet Shave category and recommended the elimination of the Stiles Razor from 58% of its stores. A Walmart product buyer, Heather Ronchetto, testified as follows:

  > Q. So, again, this is the – the final December 2008 matrix based on Matt's e-mail. So just to make sure that I'm reading this correctly, is this saying that prior to this matrix, the Stiles Razor was in 3,075 stores that, I guess, pursuant to this matrix it would be in 1,777 stores for a loss of – or for a decrease of 1,298 stores for the coming time period?
  > A. Yes.
  > (Ronchetto deposition 88:19-89:2; Exhibits 4, 5 (WM-STILES-0009792, WM-STILES-0009793)).

- As a result, during the first few weeks of 2009, the Stiles products were removed from approximately 1,000 Walmart stores. (Ronchetto deposition Exhibit 40, WM-STILES-0000863). By February 2009, despite a one-week achievement of a 114% increase in sales, the Stiles Razor was removed from additional 900 stores. (Ronchetto deposition, Exhibits 9, 49).

- In the fall of 2009, Walmart tasked P&G with creating a single 2010 modular specification, which would set prices and output, and would also decide which Wet Shave products to add, delete or carryover. (WMSTILES-0003320; WM-STILES0003327). Internal e-mails showed that in the fall of 2009 Cheryl Chapman of P&G worked directly with Walmart's Ronchetto to set the quantity and price of Stiles Razors that would be offered for sale in Walmart's stores. For example, on November 16, 2009, Ronchetto wrote an e-mail to Chapman with the subject "Stiles" stating: "I don't want to give her more stores. Can we put something else in the place of that item in some of the modulars?" (WM-STILES-0002185).) Chapman agreed to provide new numbers by noon the next day (WM-STILES-0002186), and then followed up as

---

[2] See 2010 Excel spreadsheet ranking items (WM-STILES-0003375); Ronchetto deposition 54:11-15, 55:6-13, 60:21-25, 61:15-19, 66:6-8, Exhibit 37, 68:23-76:1, 71:8-11, 69:18-19, 75:19-76:1, 79:8-16, 83:4-23; October 8, 2008 P&G's Sales Forecasts to Walmart (WM-STILES-0004538–0004539); October 13, 2008 Email from P&G re Inventory Report and New Item Tracker (WM-STILES-0004545–0004546); October 13, 2008 Email from P&G re Inventory Report and New Item Tracker (WM-STILES-0004545-0004546); October 13, 2008 P&G's Inventory Report (WM-STILES-0004547); October 13, 2008 Pricing Analysis, Sales, and Inventory Information for Products in Walmart's Wet Shave Category (WM-STILES-0004548); 2010 Line Review, Brand Ranking, and Modular Placement for Stiles Razor (WM-STILES-0003319); 2010 Line Review, Brand Ranking, and Modular Placement for Stiles Razor (WM-STILES-0003326); August 20, 2009 Email re Recommendation to Carry Forward the Stiles Razor (WM-STILES-0003316- 0003318); September 18, 2009 Email from Walmart re Add/Delete #3 (WM-STILES-0003320); September 18, 2009 Email from Walmart re Add/Delete (WM-STILES-0003327).

promised: "I just checked the matrix vs the modulars, I can take it out of 14 traits (these are 24ft mods where it moves less than 1 USW) and the store count would go down by 26 stores. It will be left in 4 traits of 24ft and all of the 28ft mods. Are you good with this? If so, I will redo the matrix and send over in the morning."(WM-STILES-0002189). Ronchetto agreed with the proposal (WMSTILES-0002197), and the Stiles Razors were removed from 26 stores in 2010 as a result.

- In March 2010, P&G again coordinated with Walmart to target Stiles—this time to delete her from the Wet Shave department entirely. Specifically, on March 20, 2010, Heather Ronchetto emailed two P&G employees, Cheryl Chapman and Nicole Sentivany, with the subject "Stiles Razor," asking "Did you remove this for the week 18 modular?" (WM-STILES-0002236). That same day, P&G's Chapman responded, "We still have it in ~1390 stores, it went down ~300 stores from last year." (Id.) That was not enough for Ronchetto—she ordered the complete deletion of the product: "Sorry but can you redo this and pull it completely from the week 18 modular. I told them it was coming out for week 18." (WM-STILES-0002237). P&G's Chapman agreed: "We will pull it out and resubmit the mods. It will probably be Friday when we resubmit." (WM-STILES-0002239).

P&G is Walmart's Wet Shave Department's largest supplier of products nationwide and was Stiles' chief competitor. They were fighting for shelf space, store count, and the overall personal styling razor market share, yet P&G was controlling the reports and recommendations to Walmart that determined Stiles' shelf space, store counts, and even dictating her product's pricing. For years, employees of P&G were responsible for conducting line reviews of the Stiles Razor in Walmart's Wet Shave department. They collected and shared confidential price and sales information, while guarding their own.

> Q. ...And those prices, once they were up loaded to Retail Link, would be immediately available to Walmart and the category advisors in wet shave, correct?
> A. Correct.
> (Ronchetto deposition 138:23-139:1)
>
> Q. So at the top, it says, "Don, I see you sent this to Walgreen's. I do not want other retailers getting my forms that we are using here at Walmart!" Why was that?
> A. I didn't want other retailers seeing how I conduct business.
> (Ronchetto deposition 139:18-23, Exhibit 17)

As a direct result of P&G's negative line reviews and recommendations, Walmart pulled the Stiles products off its shelves and ultimately terminated its relationship with Stiles in 2012.

> Q. ...And then the next line is, "if the item does not perform at 6 U/S/W and meet the contribution requirements that are on the line review, her item will be deleted May 2010 with the wet shave modular update." Do you see that?
> A. Yes.

Q. And what did you mean when you wrote that?
A. I mean that if the item did not perform at 6 units per week and meet the contribution that was on the line review, that her item was going to be deleted from the mod and removed from Walmart.
(Ronchetto deposition 199:18-200:6, Exhibit 41).

Concurrently with the efforts to get rid of Stiles, Walmart entered into an agreement with another one of Stiles' direct competitor Defendant AI (the largest manufacturer and supplier of personal styling razors and the producer of Walmart's competing Salon Perfect brand of beauty products) to manufacture an exact copy of the patented Stiles Razor for sale at Walmart. (AII_00000619-00000620; AII_00000624; 00000849; AII_00002324; AII_00002406; AII_00001134-1140).

Because Stiles was terminated from Walmart, no other store would stock her product. She continued to seek placement at other retailers for years, but was rejected by each due to her razor being dropped at Walmart. Deterred by the fact that Walmart dropped the product, other retailers simply refused to take the risk of stocking it—particularly given the risk of reprisal from Walmart and the leading competitors in the market with control over Walmart's shelves and prices. The damage was irreparable, and P&G's involvement is now undeniable.

"Size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *American Tobacco Co. v. United States*, 328 U.S. 781, 796 (1946), *quoting United States v. Swift Co.*, 286 U.S. 106, 116 1932). P&G, which boasted that it controlled 70% of all razors manufactured in the United States and that it was at least five times larger than its next closest competitor, was an active participant in the conspiracy with the Defendants to "push Stiles out of the submarket" of disposable personal styling razors. P&G did not earn its way into the razor market. It simply bought it. In 2005, P&G acquired the Gillette Company, which was then the largest manufacturer of razors in the United States. That acquisition gave P&G the power to fix prices and/or exclude competition. Nor was P&G a stranger to violating the U.S. antitrust laws by unlawfully attempting to acquire major markets instead of competing for them. *See FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967); *see also In the Matter of Proctor & Gamble Co. and Billie, Inc.*, FTC No. 2010042 (2020).

Combination between and among Walmart, the largest retailer in the United States – P&G, the largest customer of Walmart and the largest supplier of consumer packaged goods and the largest manufacturer of razors – and AI, the largest manufacturer and supplier of personal styling razors and the actual co-conspirator with Walmart who manufactured Walmart's razors to be sold at retail and manufactured its own razors and agreed with Walmart to violate Stiles' patents by manufacturing infringing razors to replace Plaintiff at Walmart – is a plain and unequivocal violation of the antitrust laws. *See Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1341-1343 (9th Cir. 1970); see also *American Tobacco Co. v. United States*, 328 U.S. 781 (1946). While the FTC opined that Category Management can be pro-competitive, the courts have rejected it. See *Conwood v. United States Tobacco Co.*, 290 F.3d 768 (2002). Absent "specific Congressional authority," P&G has no immunity from prosecution under the Sherman Act. *See United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 225-228 (1940).

This combination allowed the three competitors to determine and/or control not only the prices charged by the competitors at retail, but also what shelf space at Walmart will be allocated to each, how much will be allocated, and most importantly, whether a competitor will be deleted from Walmart altogether, which, as Walmart has admitted, would be the death knell of the competitor since anyone rejected by Walmart will "go out of business." (Ronchetto deposition 225:19-22). Together they controlled virtually all of the grooming and beauty accessories sold in the United States, which resulted in the exclusion of Stiles' products from not only Walmart's shelves but from retail shelves throughout the country.

Stiles now seeks to hold P&G accountable for destroying her business and committing egregious antitrust violations.  Specifically, she intends to move the Court for an order granting (1) leave to amend the complaint to add P&G as the Defendant in Case No. 2:14-cv-2234; and (2) divestiture of the Gillette Company from P&G.

Enclosed please find the following: _____

If you have any questions or want to discuss any of the above, please don't hesitate to contact me.

Sincerely,

Jose _. .l. Alofo

# Exhibit B

1    **Pierce Bainbridge Beck Price & Hecht LLP**
     Brian J. Dunne (SBN 275689)
2    *bdunne@piercebainbridge.com*
     Yavar Bathaee (SBN 282388)
3    *yavar@piercebainbridge.com*
     David L. Hecht (*pro hac vice*)
4    *dhecht@piercebainbridge.com*
     355 South Grand Avenue, 44th Floor
5    Los Angeles, California 90071
     (213) 262-9333
6

7    **Dhillon Law Group Inc.**
     Harmeet K. Dhillon (SBN 207873)
     *harmeet@dhillonlaw.com*
8    Nitoj Singh (SBN 265005)
     *nsingh@dhillonlaw.com*
9    177 Post Street, Suite 700
     San Francisco, CA 94108
10   (415) 433-1700

11   *Attorneys for Plaintiffs Sharidan Stiles and Stiles 4 U, Inc.*

12               UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15   SHARIDAN STILES, an individual, STILES 4 U, INC., a California corporation | Case No. 2:14-cv-02234-MCE-CMK |
| 17             Plaintiffs, | **Plaintiffs Sharidan Stiles and Stiles 4 U, Inc.'s** |
| 18              v. | **(1) Notice of Motion and Motion Seeking Leave to Join Additional Defendants** |
| 19   WALMART INC., and AMERICAN INTERNATIONAL INDUSTRIES, | |
| 20             Defendants. | **(2) Memorandum of Points and Authorities** |
| 21 | **Hon. Morrison C. England, Jr.** |
| 22 | **Hearing date: August 8, 2019** |
| | **Courtroom: 7** |
| 23 | **Time: 2:00 P.M.** |
| 24 | |

25

26

27

28

1

**TABLE OF CONTENTS**

Page

INTRODUCTION………………………………………………………………………1

BACKGROUND……………………………………………………………………...2

   A. Procedural History………………………………………………………...2

   B. Walmart, AI, Coty, PWC, and P&G Openly Shared Price Information, Fixed Prices, and Controlled Walmart's Shelves……………………………4

   C. Stiles's Competitors Used their Brazen Price-Fixing Scheme to "Delete" Stiles from Walmart's Shelves and to Clone Stiles' Product……………………………………………………………………….....7

   D. Stiles Is "Blackballed" From the Retail Market……………………..…….14

ARGUMENT………………………………………………………………………14

CONCLUSION……………………………………………………………………17

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Federal Rules of Civil Procedure 15, 19 and 20, Plaintiffs Sharidan Stiles and Stiles 4 U, Inc. ("Plaintiffs" or "Stiles"), by and through the undersigned counsel, respectfully submit this brief in support of Plaintiffs' Motion Seeking Leave to Join Additional Defendants (the "Motion").

## INTRODUCTION

Plaintiffs submit this Motion to alert the Court to alarming revelations from documents recently produced in discovery, and to request leave to join additional defendants in the action. Specifically, documents produced by current Defendants and third parties reveal a multi-year price and output fixing scheme of unprecedented scale: Defendants Walmart, Inc. ("Walmart") and American Industries ("AI") (collectively "Defendants"); and proposed defendants Coty Inc. ("Coty"), Pacific World Corporation ("PWC") and Procter & Gamble Co. ("P&G") (the "Proposed Defendants") brazenly exchanged price and sales information while simultaneously dividing up shelf space at Walmart's stores throughout the United States. (*See, e.g.*, Declaration of Brian Dunne ("Dunne Decl." or "Ex."), Ex. 1 (November 10, 2014 Email chain between PWC's Rachel Brown, AI employees, and Walmart employees) (Doc ID 6899);[1] *see also* pp. 3–13, *infra*.) This multi-year price fixing scheme was among ***direct horizontal competitors***, and Walmart served as both a co-conspirator and a platform for the conspiracy. (*See* pp. 3–13 *infra*.)

Unbeknownst to Stiles until documents were recently produced in discovery, it was this scheme among competitors, who together controlled virtually all of the beauty accessories sold in the United States, that resulted in the exclusion of Stiles's products from not only Walmart's shelves but from retail shelves throughout the country. The Defendants already in this action and the Proposed Defendants worked together to

---

[1] This document was first produced to Plaintiff on or about May 6, 2019.

1   Walmart (and other retail stores throughout the U.S.) and simultaneously cloned by

2   Walmart and one of its most important suppliers, AI.

3        In her first complaint, Stiles asserted patent and trade secret claims against

4   Walmart and AI (Dkt. No. 1 at p. 4), but amended her Complaint on March 27, 2015,

5   to assert, among other causes of action, antitrust claims under Sections 1 and 2 of the

6   Sherman Act and under California's Cartwright Antitrust Act (Dkt. No. 16, at pp. 26–

7   28).[2]

8        Stiles retained counsel for the first time—the Alioto Law Firm ("Alioto")—on

9   March 11, 2016, after motions to dismiss the original complaint had been briefed and

10  argued.  (Dkt. Nos. 46–47.).  Alioto amended the operative complaint on behalf of

11  Stiles several times (Dkt. Nos. 56 & 117), and, after motions to dismiss and motions

12  for reconsideration, filed the operative Fourth Amended Complaint (Dkt. No. 142),

13  which survived another Rule 12 challenge by Defendants.  Unsatisfied with the Court's

14  latest ruling, Defendants filed a motion for reconsideration on April 18, 2019.  (Dkt. No.

15  193.)

16       While briefing on Defendants' motion for reconsideration continued, Stiles re-

17  placed the Alioto firm with the undersigned counsel on May 21, 2019, and the Court

18  allowed the substitution of counsel on June 3, 2019.  (Dkt. No. 221.)  New counsel

19  immediately obtained and reviewed documents produced by Defendants and third

20  parties in response to discovery requests.

21       The heavily redacted documents told an alarming story—and finally explained

22  why Walmart and AI appeared to have abruptly shut Stiles out of Walmart's stores,

23  and eventually the entire retail market:  From at least 2008 through the period Plain-

24  tiffs' products were "deleted" from Walmart shelves, Walmart, AI and three of Stiles's

25  _____

26  [2] Stiles, proceeding *pro se*, also filed several complaints against several defendants,
    including some of the Proposed Defendants—namely, Coty and PWC.  (*See, e.g.,*
27  Complaint, 2:14-cv-01637 (July 11, 2014).)  Although Stiles suspected that Coty and
    PWC were involved in her ouster from Walmart's shelves, she was persuaded by
28  Walmart's counsel that she lacked the factual basis to press claims against them, and
    she voluntarily dismissed those actions without prejudice.

1   Category Advisors' direct competitors.  Beauty Category Advisor PWC, for example,

2   routinely compiled historical sales information for itself and each of its competitors,

3   including sales and quantity information by product and competitor.  (Ex. 4a (October

4   4, 2015 Email attaching a PWC Weekly Category Report) (Doc. ID 11386); Ex. 4b

5   (October 4, 2015 Weekly Category Report—Beauty Accessories Spreadsheet) (Doc.

6   ID 11389).)  Indeed, Category Advisors routinely compiled weekly sales and volume

7   information for every brand and every product in a particular category.  (Ex. 5 (June

8   26, 2016 Weekly Category Pivot Table Report) (Doc. ID 7995).)

9        These Category Advisors used their privileged role to share pricing and output

10  data with competitors and to provide information required for coordination among

11  them.  For example, P&G served as the Category Advisor for Walmart's Wet Shave

12  category, which included Stiles' product, from 2008 to 2010.  Documents produced in

13  this case on May 16, 2019, show that a representative of P&G provided sales fore-

14  casts and "add/delete/carryover" recommendations for P&G's direct horizontal com-

15  petitors, including Stiles, beginning as early as 2008.  (Ex. 6 (October 8, 2018 P&G's

16  Sales Forecasts to Walmart) (WM-STILES-0004538–0004539); Ex. 7 (October 13,

17  2008 Email from P&G re Inventory Report and New Item Tracker) (WM-STILES-

18  0004545–0004546).)  Walmart also produced an October 13, 2008 email from Mat-

19  thew Williamson of P&G to Heather Ronchetto of Walmart titled "Week 37 Inventory

20  Report and New Item Tracker," attaching two Excel spreadsheets created by Sarah

21  Kamm of P&G, that analyze price, sales, and inventory information for new and car-

22  ryover products throughout the Wet Shave category, including P&G's direct horizontal

23  competitors.  (Ex. 7 (October 13, 2008 Email from P&G re Inventory Report and New

24  Item Tracker) (WM-STILES-0004545-0004546); Ex. 8 (October 13, 2008 P&G's In-

25  ventory Report) (WM-STILES-0004547); Ex. 9 (October 13, 2008 Pricing Analysis,

26  Sales, and Inventory Information for Products in Walmart's Wet Shave Category)

27  (WM-STILES-0004548).)

28

1   (All_00000018–00000027); Ex. 31 (October 14, 2011 Email from Coty) (WM-STILES-
2   0001961-0001962); Ex. 32 (October 14, 2011 Email from Coty) (WM-STILES-
3   0001963).)  The degree of information sharing and coordination among these horizon-
4   tal competitors—based on competitor price and output information—is alarming.  For
5   example, Stiles's direct competitors were not only tasked by Walmart to collect, com-
6   pile and share price and output data, but to perform analyses of competitors' prices
7   and sales information, including the sales, price and cost information that Stiles pro-
8   vided them.  (Ex. 15 (October 7, 2011 Email from Coty) (WM-STILES-0001954-
9   0001955); Ex. 16 (October 6, 2011 Excel spreadsheet providing analysis of the Stiles's
10  products) (WM-STILES-0001956); Ex. 17 (October 17, 2011 Excel spreadsheet
11  providing analysis of the Stiles's products) (WM-STILES-0001960); Ex. 33 (October
12  17, 2011 Email from Coty) (WM-STILES-0001957-0001959).)

13      **C.    Stiles's Competitors Used their Brazen Price-Fixing Scheme to**
            **"Delete" Stiles from Walmart's Shelves and to Clone Stiles'**
14          **Product.**

15      Walmart and its suppliers not only brazenly exchanged competitor price and
16  output information, they weaponized it.  By 2008, Stiles's products were performing
17  well, selling approximately six units per store/per week in 2008.  (*See* Fourth Amended
18  Complaint (Dkt. No. 142) ("Compl.") ¶ 29.)  When Heather Ronchetto took over as
19  Stiles's contact at Walmart in June 2008 (*Id.* ¶ 30), Stiles Razor sales were suddenly
20  and—from Stiles's external perspective, inexplicably—hampered by Walmart, with
21  Stiles's products being removed from stores where the products performed best.  (*Id.*
22  ¶ 34).  Unbeknownst to Stiles, however, Heather Ronchetto was coordinating with one
23  of Stiles's competitors, P&G, which manufactured and sold disposable razor products,
24  to remove Stiles' products from Walmart shelves.

25      Indeed, in August 2009, ahead of the 2010 shelf modular, Walmart employee
26  Sara Sly sent out request to all Wet Shave suppliers, including Stiles, to provide con-
27  fidential information for 2010 modular decisions in the Wet Shave category.  (Ex. 12
28  (August 20, 2009 Email re Stiles Razor) (WM-STILES-0003317).)  The form provided

1  (Ex. 20 (November 16, 2009 Email from P&G) (WM-STILES-0002189).)  Ronchetto

2  agreed with the proposal (Ex. 21 (November 17, 2009 Email from Walmart) (WM-

3  STILES-0002197)), and the Stiles Razor was removed from 26 stores in 2010 as a

4  result.

5        In March 2010, Ronchetto again coordinated with P&G to target Stiles—this

6  time to delete her from the Wet Shave department entirely.  Specifically, on March 20,

7  2010, Heather Ronchetto emailed two P&G employees, Cheryl Chapman and Nicole

8  Sentivany, with the subject "Stiles Razor," asking "Did you remove this for the week

9  18 modular?"  (Ex. 22 (March 10, 2010 Email from P&G) (WM-STILES-0002236).)

10  That same day, P&G's Chapman responded, "We still have it in ~1390 stores, it went

11  down ~300 stores from last year."  (*Id.*)  That was not enough for Ronchetto—she

12  ordered the complete deletion of the product:

13         Sorry but can you redo this and pull it completely from the
         week 18 modular.  I told them it was coming out for week
14         18.

15

16  (Ex. 23 (March 10, 2010 Email from Walmart) (WM-STILES-0002237).)  P&G's Chap-

17  man agreed:

18         We will pull it out and resubmit the mods.  It will probably
         be Friday when we resubmit.
19

20  (Ex. 24 (March 10, 2010 Email from P&G) (WM-STILES-0002239).)  There was no

21  indication that the decision—*made among horizontal competitors*—had anything to

22  do with Stiles's product sales.  Rather, a contemporaneous spreadsheet dated a few

23  months after Walmart and P&G removed Stiles's product from the Wet Shave cate-

24  gory, makes clear that P&G was, by far, the largest of Walmart's suppliers in the cat-

25  egory:

26

| Supplier | Number of Wet Shave Products 2010 Week 17 |
|---|---|
| Procter & Gamble | 110 |

1  Walmart would "benefit[] from not needing a one sku vendor."  Specifically, in a Feb-

2  ruary 18, 2011 e-mail, an AI employee recorded notes of a meeting with Walmart's

3  Gifford:

4  **NEW SALON PERFECT WALL LASH ITEMS PROPOSED:**
   - Proposed New Salon Perfect Lash & Brow Accessories Items:  Demi Wispies Self-Adhesive Lash, Demi Wispies Starter Kit, lower
5     lash, individual lash combo tray, Salon Perfect Brush-On Lash adhesive, 3 new Diva lashes: Flirty, Navy/Black, and Royal
      Purple/Black Lashes, and 3 styles of "Value-pack" lash packs
6  - Esther seemed to like all proposals
   - Also proposed "skinny" razor pack. This is proposed to replace the Stiles Item
   - We confirmed with Esther that Stiles is a "one sku vendor"-we stated outright that we can and would like to replace the item-she
7     benefits from not needing a one sku vendor.
   - Esther also asked us/requested to "represent" all of our Brow Gel items in all colors that we offer for 2012.
8  - Presented Flutter by Salon Perfect (see below notes about Tween)
   - Presented Ardell Lashes (see notes about our thoughts that Salon Perfect and Ardell co-exist not one or the other)
   - Proposed 2 sku DUO Adhesives- a must

9  (Ex. 35 (February 18, 2011 Email from AI) (AII_00000619–00000620).)

10      Immediately thereafter, the same AI employee reached out to Reuben Driggers,

11  AI's brand manager for Salon Perfect, to make sure that an appropriate razor was

12  "sourced":

13  Reuben
14  How soon would we be able to "source" the new proposed Salon Perfect "Skinny Razors"?

    Just wanted to remind you as per our discussion, that if we are able to "source" the skinny razors prior to 2012 modular, I think it would
15  be a good idea to ADD IN this item into our October Towers and Sidekicks, as Esther has asked us to rework those promos anyway.....

16  I would like to see A.I.I. have the opportunity to achieve those sales with our item, even if in the promo unit, rather the competitor's
    "Stiles" item on the wall.....

17  Thoughts?

18  *Thank you!*
    *Delight Slotemaker de Bruine*
19  *American International Industries*

20  (Ex. 26 (February 24, 2011 Email from AI) (AII_00000624).)[3]

21      By March 2, 2011, AI had created its "Walmart AII Spring 2012 New Item Pro-

22  posals" (Ex. 27 (March 2, 2011 Excel spreadsheet) (AII_00000028)), which included

23  "Salon Perfect Perfectly Brow SP 'Skinny' 3-Pack Razors," priced at $2.98 with a $1.95

24  item cost.  (*Id.* at Row 36.)  The explanation for the price and cost of the new "SP

25  'Skinny' 3-pack Razors" was "[s]ame cost/retail as existing SP Razor Combo (replace

26  _____
    [3] AI ultimately "sourced" its Salon Perfect Micro Razor by delivering a handful of Stiles
27  Razors to a factory in China, and asking the Chinese factory to copy them.  (*See, e.g.,*
    Ex. 36 (September 20, 2012 Email from AI) (AII_00000849); Ex. 37 (Photo attached
28  to email dated September 20, 2012) (AII_00002406); Ex. 38 (April 8, 2013 Email from
    AI)  (AII_00001134)).

1   (Ex. 15 (September 26, 2011 Email from Walmart) (WM-STILES-0001954).)

2       On October 7, 2011, Coty provided Walmart its analysis of Stiles Razor histor-
3   ical and projected sales. (Ex. 15 (October 7, 2011 Email from Coty) (WM-STILES-
4   0001954).) According to Coty, "[i]n the Current Modular, Stiles is out-performing the
5   Average Benchmark of the top 80% of items by 17%." (Ex. 16 (Coty's Excel spread-
6   sheet attached to email dated October 7, 2011) (WM-STILES-0001956).)  However,
7   Coty predicted—for reasons unexplained in the Coty analysis—that "[i]n the Wk 49
8   Modular, Stiles is projected to under-perform the Average Benchmark of the top 80%
9   items by -38%." (Id.)

10      On October 11, 2011, Walmart sought Stiles's 2008 Wet Shave sales infor-
11  mation for its "vendor review." (Ex. 31 (October 14, 2011 Email from Coty) (WM-
12  STILES- 0001961).)  Stiles's horizontal competitor, P&G, provided the requested in-
13  formation, which Walmart then forwarded to Stiles's other competitor, Coty. (Id.; Ex.
14  32 (Coty's Excel Spreadsheet attached to email dated October 14, 2011) (WM-
15  STILES-0001963).)

16      Walmart's Esther Gifford repeatedly requested that Coty redo its sales analysis
17  of the Stiles Razor. (Ex. 15 (October 7, 2011 Email from Coty) (WM-STILES-0001954-
18  0001955); Ex. 16 (October 6, 2011 Excel spreadsheet providing analysis of the Stiles's
19  products) (WM-STILES-0001956); Ex. 17 (October 17, 2011 Excel spreadsheet
20  providing analysis of the Stiles's products) (WM-STILES-0001960).)  She did so be-
21  cause she would have to convince Theresa Barrera and Carmen Bauza—the two
22  Walmart Supplier Diversity representatives who had spearheaded Stiles's addition to
23  the Beauty category for 2011—that Stiles would be "deleted from the department 2
24  shave category due to productivity." (Ex. 34 (October 12, 2011 Email between
25  Walmart employees) (WM-STILES-0002437).)  Coty's analysis, however, repeatedly
26  failed to support the pretext she sought to manufacture, as they showed that Stiles
27  was at the time outperforming its competition in the Beauty department. (Id.)

28

1  Plaintiffs respectfully request that all of these co-conspirators be joined immediately
2  in the action, with a new complaint against all of the parties to be filed as soon as
3  practicable.  The Court should grant the request for three independent reasons:

4       *First*, Proposed Defendants are necessary parties to the action because "the
5  court cannot accord complete relief among existing parties."   FED. R. CIV. P.
6  19(a)(1)(A).  Indeed, Plaintiffs seek an injunction to bar Defendants and Proposed
7  Defendants from continuing a naked price fixing conspiracy that allows them to ex-
8  clude Plaintiffs from retailers throughout the country.  (Compl. ¶ 7 & p. 39.)  A piece-
9  meal injunction binding only existing parties would not prevent blackballing by absent
10 parties, nor would it prevent the absent parties from continuing to coordinate on price,
11 output and cost.

12      *Second*, even if Proposed Defendants are not necessary to the action, permis-
13 sive joinder is appropriate.  Under Rule 20(a)(2), a defendant may be joined in an
14 action if (i) "any right to relief is asserted against them jointly, severally, or in the alter-
15 native with respect to or arising out of the same transaction occurrence, or series of
16 transaction or occurrences," and (ii) "any question of law or fact common to all defend-
17 ants will arise in the action. FED. R. CIV. P. 20(a)(2)(A).  Here, there is no question that
18 all of the Proposed Defendants are part of the same conspiracy alleged against
19 Walmart and AI.  *Fifty-Six Hope Rd.* v. *Jammin Java Corp.*, 2016 U.S. Dist. LEXIS
20 189119, at *32 (C.D. Cal. Dec. 8, 2016) (joinder appropriate under Rule 20 when civil
21 conspiracy is alleged).  Indeed, it was discovery of Walmart and AI that revealed Coty,
22 PWC and P&G's role in the conspiracy to share and set prices and to exclude Plaintiffs
23 from retailers.  For the same reason, the question of law and fact in this case are
24 common to Proposed Defendants and Defendants alike—namely, whether they to-
25 gether violated Section 1 of the Sherman Act and are jointly and severally liable for
26 damages. *See Oracle Am., Inc.* v. *Micron Tech., Inc.*, 817 F. Supp. 2d 1128, 1131
27 (N.D. Cal. 2011) (defendants in Section 1 Sherman Act claim are jointly and severally
28 liable for damages under Section 4 of the Clayton Act).

1    **CONCLUSION**

2    For the reasons stated above, Plaintiffs' motion should be granted.

3

4    Dated: June 28, 2019

5

6                                    Respectfully submitted,

7                                    **Pierce Bainbridge Beck Price &**
                                     **Hecht LLP**
8

9    By:   /s/ Brian J. Dunne
           Brian J. Dunne (SBN 275689)
10          bdunne@piercebainbridge.com
           Yavar Bathaee (SBN 282388)
11          yavar@piercebainbridge.com
           David Hecht (*pro hac vice*)
12          dhecht@piercebainbridge.com
           355 South Grand Avenue, 44th Floor
13          Los Angeles, California 90071
           (213) 262-9333
14
           **Dhillon Law Group Inc.**
15
           Harmeet K. Dhillon (SBN 207873)
16          harmeet@dhillonlaw.com
           Nitoj Singh (SBN 265005)
17          nsingh@dhillonlaw.com
           177 Post Street, Suite 700
18          San Francisco, CA 94108
           (415) 433-1700
19
           *Attorneys for Plaintiffs Sharidan Stiles*
20          *and Stiles 4 U, Inc.*

21

22

23

24

25

26

27

28

# Exhibit C

**Law Firm : Federal Trade Commission**

## Cases

Stiles v. Walmart Inc.(March 12, 2020.)
United States District Court, E.D. California. No. 2:14-cv-02234-KJM-DMC.No. 2:19-cv-02146-KJM-DB.
Stiles v. Walmart Inc.(March 3, 2020.)
United States District Court, E.D. California. Case No. 2:14-cv-02234-MCE-DMC.
Stiles v. Walmart, Inc.(March 5, 2020.)
United States District Court, E.D. California. No. 2:14-CV-2234-KJM-DMC.
Stiles v. Walmart, Inc.(March 5, 2020.)
United States District Court, E.D. California. No. 2:14-CV-2234-KJM-DMC.
Stiles v. Walmart, Inc.(February 14, 2020.)
United States District Court, E.D. California. No. 2:14-CV-2234-JAM-DMC.
Stiles v. Walmart, Inc.(February 12, 2020.)

# Exhibit D



### RE:[CASE 2177316431] Category Change

Amazon Seller Support

Sent: Sunday, April 30, 2017 at 3:35 PM
To: snaridan@stileerazor.com

This is the screen shot where you can see that the store front target was the creator of this ASIN: B004EBFY70, item name: Stiles Eyebrow Razor Black 2-Pack Made in the USA!!!

To see the file named "screen shot.PNG" included with this correspondence, please use the Seller Central case link given below the signature.

Thank you for selling with Amazon,

Marcus
Amazon.com Seller Support
========================================
MORE WAYS TO GET HELP:
Visit our Seller Forums for help from other sellers: http://sellercentral.amazon.com/forums
Browse all Seller Help topics: http://sellercentral.amazon.com/gp/help

Please note: this e-mail was sent from a notification-only address that cannot accept incoming e-mail. Please do not reply to this message.

To contact us again about this issue, please use the Contact Us form using the following link:
https://sellercentral.amazon.com/gp/contact-us/contact-amazon-form.html?ie=UTF8&caseID=2177316431

# Exhibit D-1

Partner:  220137677                              (Change)
Enter partner ID, friendly name, full e-mail address, or case ID

Seller Overview   Payments & Transactions   Orders   Seller Performance   **ASIN Troubleshooting**   FBA   Issue Tracking

Asin Details  |  Asin Images  |  Incorrect Information on Detail Page  |  Listings TroubleShooter

Asin:
B004EBFY70     Go

**Title:**                                    **Creation Date:**                        **Status:**
stiles Eyebrow Razor Black 2-Pack Made in the USA    2010-11-29T19:12:43.056-00:00        Healthy

**Has Amazon Retail Contribution:**          **ASIN Creator:**
No                                           Target (529342171)
Authoritative Contributions (0)

Filter  None   ▾
   (Clear)

# Exhibit D-2

RE: Stiles Razor Vendor Target.com (Ecom) Vendor ID is: 74600 Target Stores (Host) Vendor # is: 1281611 – Temporary Items

Message

        

Delete   Reply   Reply All   Forward   Move   Junk   Unread   Categorize   Follow Up

## RE: Stiles Razor Vendor Target.com (Ecom) Vendor ID is: 74600 Target Stores (Host) Vendor # is: 1281611

**Kristen Lintz**
Sent: Wednesday, March 18, 2015 at 12:41 PM
To: S. L. Stiles
Cc: Erica Hageman

Sharidan,

Can you please submit an updated casepack of 24/24 in IMN for item 15-0062? Also, can you send me a list of the skus you have in class 15?

Thanks,

Kristen

From: Amanda Lattimer
Sent: Wednesday, March 18, 2015 2:38 PM
To: S. L. Stiles; Kristen Lintz
Subject: RE: Stiles Razor Vendor Target.com (Ecom) Vendor ID is: 74600 Target Stores (Host) Vendor # is: 1281611

Sharidan – please work with Kristen on PO's.

Thanks,
Amanda

Amanda Lattimer | Buyer – Hair Care & Cosmetics | Target.com | 1000 Nicollet Mall TPS-16292, Minneapolis, MN 55403 | 612.304.1683

From: S. L. Stiles [mailto:sharidan@stilesrazor.com]
Sent: Wednesday, March 18, 2015 2:09 PM
To: Amanda Lattimer
Subject: Stiles Razor Vendor Target.com (Ecom) Vendor ID is: 74600 Target Stores (Host) Vendor # is: 1281611

Amanda,

Please send PO for the 6-Pack razors we are low on the inventory.

| Status | DPCI | DropShip Flag | Description | Program Code | Target.com Item # | ASIN | Mfg Style # | UPC |
|---|---|---|---|---|---|---|---|---|
| ACTIVE | 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 | YES | Stile Eyebrow Razor 9ct multi | 13230879 | 13230879 | B004EB1DU8 | ERM-6 | 892923000098 |

Thank you,

 STILES

Sharidan Stiles
Founder/President: Stiles 4U Inc.   Stiles Razor
779 Harlan Drive, Redding, California 96003-3479
Direct: 530-229-1097  Fax:  530-229-9907  Mobile: 530-339-1933
E-mail: sharidan@stilesrazor.com  web: http://www.stilesrazor.com

PRIVILEGED AND CONFIDENTIAL COMMUNICATION
This electronic transmission, and any documents attached hereto, may contain confidential and/or legally privileged information. The information is intended only for use by the recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution, or use of the contents of information received in error is strictly prohibited.

# Exhibit D-3



**Kristen Lintz**
Buyer Behavior Expert Procter &
Gamble

Dismiss          **Connect**

# Exhibit D-4

C    Q Search

◉                              **Accounts Payable**                      Sharidan Stiles, Stiles Personal Care Inc | ⊘ | Sign Out

 enter a new search

Account Payable Summary

**Account Payable Summary**
**Vendor** : 0003872918,
**Account Status** : Available for Payment

**Confidential**

| Balance Date | Account Status | Account Balance ($) | Open Invoices ($) | Total Open Credit Memos ($) | Total Open Debit Memos ($) |
|---|---|---|---|---|---|
| 07/01/2015 | Available for Payment | 64,593,372.58 | 82,725,100.38 | -28,893,064.00 | 9,130,261.71 |

Check information updates every Wednesday and Friday if new cheques are issued

# Exhibit D-5

| | |
|---|---|
| **From:** | Tcom.InvoicingM-Z |
| **Sent:** | Monday, July 6, 2015 8:34 AM PDT |
| **To:** | sharidan@stilesrazor.com |
| **Subject:** | FW: Trying to find invoicng |
| **Attachments:** | Screen Shot 2015-07-01 at 1.15.35 PM.png, image001.jpg |

Hi Sharidan,

This looks like a POL set up issue. Please call 612-304-3310, option 3, then option 5 or use the Request Support link at the bottom of POL pages.

Thanks.

Molly 

Merchandise Payables Specialist – Target.com | Target Corporation | Tcom.Invoicing@Target.com
AP.Helpdesk@Target.com |612-307-9208 (ph) |www.partnersonline.com

This message (including any attachments) may contain confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** S. L. Stiles [mailto:sharidan@stilesrazor.com]
**Sent:** Wednesday, July 01, 2015 3:40 PM
**To:** Tcom.InvoicingM-Z
**Subject:** Trying to find invoicng

Hello,

Attached is a screen shot of my previous name with a different Vendor # I believe.

This is my new EDI set up:
**URL:**     https://vendorportal.gxs.com/eservices/

| USER ID | PASSWORD |
|---|---|
| sharidan@stilesrazor.com | ss@123 |

Target.com (Ecom) Vendor ID is: **74600**
Target Stores (Host) Vendor # is:  **1281611**

Please help me to retrieve unpaid invoicing.

**Sharidan Stiles**
**Founder/President:** Stiles 4U Inc.; Stiles Razor
2570 Harlan Drive; Redding, California 96003-3479
**Direct:** 530-229-1007 **Fax:** 530-229-9007 **Mobile:** 530-339-1933
**E-mail:** sharidan@stilesrazor.com **web:** http://www.stilesrazor.com

PRIVILEGED AND CONFIDENTIAL COMMUNICATION:
This electronic transmission, and any documents attached hereto, may contain confidential and/or legally privileged information. The information is intended only for use by the recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution, or use of the contents of information received in error is strictly prohibited.

# Exhibit E

0510115

# UNITED STATES OF AMERICA
# BEFORE FEDERAL TRADE COMMISSION

COMMISSIONERS:    **Deborah Platt Majoras, Chairman**
                        **Thomas B. Leary**
                        **Pamela Jones Harbour**
                        **Jon Leibowitz**

|  |  |  |
|---|---|---|
| **In the Matter of** | ) | |
| | ) | |
| **THE PROCTER & GAMBLE** | ) | |
| **COMPANY, a corporation;** | ) | |
| | ) | |
| **and** | ) | **Docket No. C-4151** |
| | ) | |
| **and THE GILLETTE COMPANY,** | ) | |
| **a corporation.** | ) | |
| | ) | |

## COMPLAINT

Pursuant to the Clayton Act and the Federal Trade Commission Act, and its authority thereunder, the Federal Trade Commission ("Commission"), having reason to believe that Respondent The Procter & Gamble Company ("Procter & Gamble"), a corporation subject to the jurisdiction of the Commission, has agreed to acquire Respondent The Gillette Company ("Gillette"), a corporation subject to the jurisdiction of the Commission, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45, and it appearing to the Commission that a proceeding in respect thereof would be in the public interest, hereby issues its Complaint, stating its charges as follows:

## I. RESPONDENT PROCTER & GAMBLE

1.      Respondent Procter & Gamble is a corporation organized, existing and doing business under the laws of Ohio with its office and principal place of business located at One Procter & Gamble Plaza, Cincinnati, Ohio, 45202.

2.      Respondent Procter & Gamble, among other things, is engaged in the research, development, manufacture, distribution, and sale of consumer products, including at-home teeth whitening products, adult battery-powered toothbrushes, and men's antiperspirants/deodorants.

3.      Respondent Procter & Gamble had worldwide net sales of approximately $51.4 billion in its 2004 fiscal year.

4.      Respondent Procter & Gamble is, and at all times relevant herein has been, engaged in commerce, as "commerce" is defined in Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12, and is a corporation whose business is in or affects commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 44.

## II. RESPONDENT GILLETTE

5.      Respondent Gillette is a corporation organized, existing, and doing business under the laws of Delaware with its office and principal place of business located at the Prudential Tower Building, Suite 4800, Boston, Massachusetts, 02199.

6.      Respondent Gillette, among other things, is engaged in the research, development, manufacture, distribution, and sale of consumer products, including at-home teeth whitening products, adult battery-powered toothbrushes, rechargeable toothbrushes, and antiperspirants/deodorants.

7.      Respondent Gillette had worldwide net sales of approximately $10.5 billion in its 2004 fiscal year.

8.      Respondent Gillette is, and at all times herein has been, engaged in commerce, as "commerce" is defined in Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12, and is a corporation whose business is in or affects commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 44.

## III. THE PROPOSED ACQUISITION

9.      Pursuant to an Agreement and Plan of Merger dated January 27, 2005, Respondent Procter & Gamble proposed to acquire 100 percent of the voting securities of Respondent Gillette for approximately $57 billion (the "Acquisition").

## IV. THE RELEVANT MARKETS

10.      For the purposes of this Complaint, the relevant lines of commerce in which to analyze the effects of the Acquisition are the research, development, manufacture, distribution, and sale of: (a) at-home teeth whitening products; (b) adult-battery powered toothbrushes; (c) rechargeable toothbrushes; and (d) men's antiperspirants/deodorants.

2

11.    At-home teeth whitening products whiten teeth by bleaching them with either hydrogen or carbamide peroxide. These products are typically sold over-the-counter through food, drug, club, and mass merchandise channels and are marketed to be used by consumers at home. There are several different types of at-home teeth whitening products, including whitestrips, gels, pens and sticks. Whitestrips and gel products account for the vast majority of sales of at-home teeth whitening products in the United States.

12.    Adult battery-powered toothbrushes are usually powered by AA or AAA batteries and either have oscillating or pulsating brush heads. The majority of adult battery-powered toothbrushes are sold for between $5 and $8, and the batteries and brush heads can be replaced on some, but not all, products. Adult battery-powered toothbrushes are typically marketed as upgrades over manual toothbrushes, while at the same time more affordable than sophisticated rechargeable toothbrushes.

13.    Rechargeable toothbrushes contain a rechargeable battery that powers high-speed oscillating, pulsating, or vibrating brush heads. They have a separate recharging unit that needs to be plugged into an electrical outlet to recharge the battery contained in the toothbrush. Brush heads for these products are almost always replaceable. Rechargeable toothbrushes typically range in price from $20 to $150, and are marketed as the premium brushing option for consumers.

14.    Antiperspirants/deodorants are applied under the arms to enhance personal hygiene, and are typically combined together for complete under-arm protection. Antiperspirants/deodorants are sold to specific gender-based segments in various forms, including roll-ons, traditional solids, invisible solids, gels, and aerosols. Men's antiperspirants/deodorants are unique in, among other things, their branding, packaging, fragrances, marketing, strength, and location on the shelf.

15.    For the purposes of this Complaint, the United States is the relevant geographic area in which to analyze the effects of the Acquisition in each of the relevant lines of commerce.

## V. THE STRUCTURE OF THE RELEVANT MARKETS

16.    The relevant market for the manufacture, distribution, and sale of at-home teeth whitening products in the United States is highly concentrated whether measured by the Herfindahl-Hirschman Index ("HHI") or two- or four-firm concentration ratios. Respondents Procter & Gamble and Gillette are the two largest suppliers of at-home teeth whitening products in the United States and are the only significant suppliers of branded at-home teeth whitening strips. Procter & Gamble is the market leader with its Crest Whitestrips® and Crest Night Effects® products, while Gillette is the second leading supplier with its Oral-B® Rembrandt® and Rembrandt® products. Together, they account for over 80% of the sales in this highly concentrated market. Accordingly, the Acquisition would significantly increase the concentration level in the United States market for at-home teeth whitening products, leaving

3

Procter & Gamble as the dominant supplier. Respondents are actual competitors in this relevant market.

17.    The relevant market for the research, development, manufacture, distribution, and sale of adult battery-powered toothbrushes in the United States is highly concentrated whether measured by HHI or two- or four-firm concentration ratios. Respondents Procter & Gamble and Gillette are the two largest suppliers of adult battery-powered toothbrushes in the United States. Procter & Gamble markets its adult battery-powered products under the Crest® SpinBrush™ brand name, while Gillette sells its adult battery-powered products under the Oral-B® brand name. Together, Respondents account for over 85% of this highly concentrated market. Accordingly, the Acquisition would significantly increase the concentration level in the United States market for adult battery-powered toothbrushes, leaving Procter & Gamble as the dominant supplier. Respondents are actual competitors in this relevant market.

18.    The relevant market for the research, development, manufacture, distribution, and sale of rechargeable toothbrushes in the United States is highly concentrated whether measured by HHI or two- or four-firm concentration ratios. Respondent Gillette and Philips Oral Health Care, Inc. ("Philips") are the only significant suppliers of rechargeable toothbrushes in the United States. Gillette markets a full line of rechargeable toothbrush products (*i.e.*, low-end to high-end) under the Oral-B® Braun® brand name, while Philips sells mostly mid to high-end products under the Philips® Sonicare® brand name. Respondent Procter & Gamble and Philips are joint venture partners in the development and marketing of the Crest® Sonicare® IntelliClean System ("IntelliClean"), the first integrated toothbrush/dentifrice product (*i.e.*, toothbrush that self dispenses toothpaste) sold in the United States. Pursuant to the Acquisition, Respondent Procter & Gamble would acquire the only significant competitor to its joint venture partner, Philips.

19.    The relevant market for the research, development, manufacture, distribution, and sale of men's antiperspirants/deodorants in the United States is highly concentrated whether measured by the HHI or two- or four-firm concentration ratios. Respondents are the two largest suppliers of men's antiperspirants/deodorants in the United States. Procter & Gamble markets its men's antiperspirants/deodorants under the Old Spice® brand name, while Gillette sells its products under the Right Guard® and Gillette Series® brand names. Together, Respondents account for over 50% of the sales in this highly concentrated market. Accordingly, the Acquisition would significantly increase the concentration level in the United States market for men's antiperspirants/deodorants, leaving Procter & Gamble as the dominant supplier. Respondents are actual competitors in this relevant market.

## VI. ENTRY CONDITIONS

20.    Entry into any relevant line of commerce would not be timely, likely, or sufficient to deter or counteract the anticompetitive effects of the Acquisition set forth in Paragraph 21 below. Entry into any of these markets would require the investment of extremely high sunk costs to, among other things, develop products, establish a brand name, and provide promotional

funding and advertising to support the product(s), which would be difficult to justify given the market structure in the affected markets. Additionally, patents and other intellectual property create significant barriers to entry in the at-home teeth whitening, adult battery-powered, and rechargeable toothbrush markets. Even if a new entrant were willing to take on such investments, it would also face the difficult task of convincing retailers to carry its products. As a result, new entry into any of these markets sufficient to achieve a significant market impact within two years is unlikely.

## VII. EFFECTS OF THE ACQUISITION

21.    The effects of the Acquisition, if consummated, may be to substantially lessen competition and to tend to create a monopoly in the relevant markets in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, in the following ways, among others:

a.    by eliminating actual, direct, and substantial competition between Respondents Procter & Gamble and Gillette for the research, development, manufacture, distribution, and sale of at-home teeth whitening products, adult battery-powered toothbrushes, and men's antiperspirants/deodorants in the United States;

b.    by reducing the merged entity's incentives to adequately support and promote the IntelliClean product and joint venture;

c.    by increasing the ability of the merged entity to unilaterally raise prices of at-home teeth whitening products, adult battery-powered toothbrushes, and men's antiperspirants/deodorants in the United States; and

d.    by reducing the merged entity's incentives to improve service or product quality for at-home teeth whitening products, adult battery-powered toothbrushes, rechargeable toothbrushes, and men's antiperspirants/deodorants in the United States.

## VII.  VIOLATIONS CHARGED

22.    The Acquisition described in Paragraph 9 constitutes a violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

23.    The Acquisition described in Paragraph 9, if consummated, would constitute a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

WHEREFORE, THE PREMISES CONSIDERED, the Federal Trade Commission on this twenty-ninth day of September, 2005, issues its Complaint against said Respondent.

By the Commission, Chairman Majoras and Commissioner Harbour recused.


                    Donald S. Clark
                    Secretary

SEAL:

6

# Exhibit F

## UNITED STATES OF AMERICA
## BEFORE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**    **Deborah Platt Majoras, Chairman**
**Pamela Jones Harbour**
**Jon Leibowitz**
**William E. Kovacic**
**J. Thomas Rosch**

In the Matter of

**THE PROCTER & GAMBLE COMPANY,**
a corporation;

and

**THE GILLETTE COMPANY,**
a corporation.

**Docket No. C-4151**
**File No. 051-0115**

FEDERAL TRADE COMMISSION
RECEIVED DOCUMENTS
FEB 2 4 2006
SECRETARY

## PETITION OF THE PROCTER & GAMBLE COMPANY
## FOR APPROVAL OF PROPOSED DIVESTITURE

Pursuant to Section 2.41(f) of the Federal Trade Commission ("Commission" or "FTC")

Rules of Practice and Procedure, 16 C.F.R. § 2.41(f) (2005), and Paragraph II.A. of the final

Decision and Order approved by the Commission in the above-captioned matter, The Procter &

Gamble Company ("P&G") hereby files this Petition for Approval of Proposed Divestiture

("Petition") requesting the Commission's approval of the divestiture of the APDO business,

including Right Guard, Soft & Dri, Dry Idea, Natrel Plus, and Balance ("the APDO Assets") of

The Gillette Company ("Gillette"), to The Dial Corporation ("Dial"), a subsidiary of Henkel

KGaA ("Henkel").

PUBLIC RECORD VERSION

## I.    INTRODUCTION

On September 23, 2005, P&G and the Commission entered into an Agreement Containing Consent Orders, including an initial Decision and Order and an Order to Maintain Assets. On October 1, 2005, pursuant to an Agreement and Plan of Merger between P&G and Gillette dated January 27, 2005, P&G completed its acquisition of Gillette. After a period of public comment, on December 15, 2005, the Commission issued its final Decision and Order ("Order") (with minor changes) and Order to Maintain Assets (without changes) (collectively, the "Consent Agreement"). At the same time it reissued its Complaint (also without changes).

Paragraph V.19 of the Commission's Complaint alleges that the acquisition by P&G of the APDO Assets would substantially lessen competition in the United States market for men's antiperspirants/deodorants because the acquisition would significantly increase the concentration level in the market, leaving P&G as the leading supplier. Paragraph IV.A. of the Order requires P&G to divest the APDO Assets within 120 days from the date the Order becomes final to a buyer approved by the Commission.

On February 20, 2006, Gillette and Dial executed an Asset Sale and Purchase Agreement (including attachments, exhibits, annexes, and schedules) (collectively, the "Agreement") for the sale of the APDO Assets. As part of the transactions contemplated by the Agreement, P&G and Dial will execute a Transitional Supply Agreement and a Transitional Services Agreement (collectively, the "TSSA") for provision of transitional supply and services by P&G to Dial. A copy of the Agreement is attached hereto as Confidential Exhibit A.

P&G desires to complete the proposed divestiture of the APDO Assets as soon as possible following Commission approval. Prompt consummation will further the purposes of the Decision and Order and is in the interests of the Commission, the public, P&G, Dial, and Henkel because it will allow Dial and Henkel to move forward with their plans for the competitive

2

operation of the divested business, and it will allow P&G to fulfill its obligations under the

Consent Agreement. P&G accordingly requests that the Commission promptly commence the

period of public comment pursuant to Section 2.41(f)(2) of the Commission's Rules of Practice

and Procedure, 16 C.F.R. § 2.41(f)(2), limit the public comment period to the customary thirty-

day period, and grant this Petition by approving the divestiture of the APDO Assets to Dial

pursuant to the proposed agreement as soon as practicable after the close of the public comment

period.

This Petition describes the principal terms of the Agreement by which P&G proposes to

divest the APDO Assets to Dial and explains why the Agreement satisfies the objectives and

requirements of the Consent Agreement by establishing a strong and effective competitor in the

sale of men's antiperspirants/deodorants in the United States.

## II.     REQUEST FOR CONFIDENTIAL TREATMENT

Because this Petition and its attachments contain confidential and competitively sensitive

business information relating to the divestiture of the APDO Assets, P&G has redacted such

confidential information from the public version of this Petition and its attachments.[1] The public

disclosure of this information would prejudice P&G, Dial, and Henkel, could cause harm to the

ongoing competitiveness of the APDO Assets, and could impair P&G's ability to comply with its

obligations under the Consent Agreement.

Pursuant to Sections 2.41(f)(4) and 4.9(c) of the Commission's Rules of Practice and

Procedure, 16 C.F.R. §§ 2.41(f)(4), 4.9(c), P&G requests, on its own behalf and on behalf of Dial

and Henkel, that the confidential version of this Petition and its attachments and the information

---

[1] For the convenience of maintaining the public record, P&G is submitting two versions of this Petition: a confidential version that contains confidential and proprietary information and documents necessary for the Commission to assess this Petition, and a redacted version that excludes confidential and proprietary information for placement on the public record.

contained therein be accorded confidential treatment under 5 U.S.C. § 552 (2000) and Section

4.10(a)(2) of the Commission's Rules of Practice and Procedure, 16 C.F.R. § 4.10(a)(2). The

confidential version of this Petition is also exempt from disclosure under Exemptions 4, 7(A),

7(B), and 7(C) of the Freedom of Information Act, 5 U.S.C. §§ 552(b)(4), (b)(7)(A)-(C), and the

Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a(h) (2000).

## III.    THE PROPOSED ACQUIRER

Paragraph IV.A of the Order requires P&G to divest the APDO Assets within 120 days

from the date the Order becomes final. Pursuant to this requirement, P&G has diligently sought

an acquirer that would be acceptable to the Commission, and, in its compliance reports

previously filed with the Commission on November 8, 2005, December 7, 2005, and January 6,

2006, P&G has provided a full description of its efforts to divest the APDO Assets.

According to the 2003 *Statement of the Federal Trade Commission's Bureau of

Competition on Negotiating Merger Remedies* (the *Merger Remedies Statement*), to be an

acceptable buyer, a divestiture acquirer must be financially and competitively viable. The

acquirer must be able—with the package of assets to be divested—to maintain or restore

competition in the relevant market. Key factors to consider in this analysis are whether the

proposed acquirer has (1) the financial capacity and incentives to acquire and operate the

package of assets, and (2) the competitive ability to maintain or restore competition in the

marketplace.

As discussed in more detail below, Henkel and Dial have both the financial capacity and

the incentives to acquire and operate the APDO Assets and also the competitive ability to

maintain or restore competition with respect to APDO sales in the United States. Henkel's and

Dial's satisfaction of these key factors demonstrates that they are an acceptable acquirer suitable

for approval by the Commission.

4

**A.    Henkel and Dial Have the Financial Ability To Successfully Complete the Transaction and Invest in the APDO Assets on a Going-Forward Basis**

Henkel is ranked #470 in the 2005 Fortune Global 500 list of the world's largest corporations,[2] with global revenues for fiscal 2005 of 11,974 million euros (more than $14 billion). It has the financial capacity, resources, and incentives to acquire the APDO Assets and ensure their continued operation as a viable, ongoing business. Henkel has operations in 125 countries and employs around 50,000 people. According to its 2005 Annual Report, the company has access to substantial assets including liquid funds and marketable securities valued at over $1.2 billion.[3] Henkel's current financial condition provides great flexibility in making additional investments in the business, as such investments may become necessary or propitious in the future.

Henkel is an established company with significant experience in the personal care category with its hair care, skin care, oral care, bath and shower, soap, deodorant, and fragrance products. And, the profitability of the APDO Assets—[CONFIDENTIAL MATERIAL REDACTED]—will provide even greater flexibility for Henkel and Dial to invest in and expand the men's antiperspirants/deodorants business in the United States.

**B.    Henkel and Dial Have and Will Acquire the Necessary Industry Experience, Customer Relationships, and Knowledge of the Divestiture Assets To Operate the Business Successfully, as Henkel and Dial Are Established and Integrated Producers and Marketers of Personal Care Products**

The Bureau of Competition's 1999 *Study of the Commission's Divestiture Process* (the *Divestiture Study*) discusses several factors that help to identify an acceptable divestiture buyer. Specifically, the *Divestiture Study* cites the buyer's experience in the relevant industry and knowledge of the assets to be purchased as key to a successful divestiture.

---

[2] Henkel's corporate headquarters is located in Düsseldorf, Germany.

[3] A copy of Henkel's 2005 Annual Report, issued February 14, 2006, is attached as Exhibit B to this Petition. Henkel's quarterly and annual reports are available online at http://financialreports.henkel.com.

Henkel has been committed to the personal care business since its founding in 1876 by Fritz Henkel in Düsseldorf, Germany. Henkel is one of the top-ten producers worldwide in cosmetics and toiletries with such brands as Fa, Vision, Diadermine, Taft, Schwarzkopf, and Dep, and holds the number three market position worldwide in the detergents and household cleaners market, with brands such as Persil, Dixan, Vernel, and Bref.

On March 29, 2004, Dial became a wholly owned subsidiary of the Henkel Group. Dial is organized into four core business units: Personal Care, Laundry Care, Home Care, and Food Products. Dial® soap, the company's namesake product, is America's number one antibacterial soap, with nearly 1 million bars sold a day. Other brands under the Dial banner include Coast®, Tone®, Pure & Natural®, Purex® laundry detergent (the number two selling detergent in the United States), and Renuzit® (one of the leading U.S. air fresheners). Henkel also acquired the got2B® line of hair care, bath and body products from Amitee Cosmetics Inc., complementing its long-standing Schwarzkopf & Henkel brands including L.A. LOOKS® and Dep®. Together with Henkel's consumer adhesives portfolio (with leading brands like Loctite®, Duck Tape®, and LePage®), North America now represents nearly one-fourth of Henkel's sales.

A key element in Dial's future growth is the development of innovative new products. During the past few years, Dial has launched new Dial Complete® Antibacterial Foaming Hand Wash, Dial® 2 in 1 Body Wash & Shave Cream and Dial® Daily Care Body Washes and Liquid Hand Soaps. Tone® introduced Tone® Lotion and Body Butter. Renuzit® has introduced Super Odor Neutralizer®, Roller Scents®, a long lasting bathroom deodorizer, and Airlets®, a long lasting and discreet air freshener that plugs into electrical outlets. Dial's Purex® brand has introduced Zout® Laundry Stain Remover liquid and spray.

The APDO Assets strongly complement Henkel's and Dial's existing consumer products business in the North America. Right Guard antiperspirants and deodorants will prove a natural

6

addition to Henkel's strong portfolio of personal care consumer brands like Dial®. The APDO

business will be able immediately to take advantage of Henkel's and Dial's distribution structure,

customer relationships, and marketing and advertising infrastructure.

The APDO Assets also should benefit from Henkel's expertise in research, development,

and marketing of antiperspirants and deodorants outside the United States. Since about 1970,

Henkel has successfully expanded its European toiletry brand Fa® from soaps to include lines of

deodorants, shower gels, and bubble baths. Henkel holds leading positions in the European

personal cleansing and deodorant markets through its international brand Fa® and a strong

portfolio of local brands such as La Toja®, bac®, and Neutromed®.

### C. Henkel Has The Competitive Ability To Maintain Or Restore Competition In The Marketplace

The *Merger Remedies Statement* suggests that the proposed acquirer have an "economic

incentive to maintain or restore competition in the relevant market." The *Divestiture Study*

emphasizes the importance of the buyer's commitment (*i.e.*, substantial investment in the

relevant business). Given Henkel's relevant experience in personal care products, Henkel is

fully qualified to operate the APDO Assets in a manner that will maintain or restore competition

in the marketplace. The Henkel management and employees are experienced in the production

and marketing of personal care products, including deodorants. Furthermore, all of the assets

needed to operate the APDO Assets competitively will be included as part of the sale to Dial. As

such, it is not anticipated that this acquisition will generate a need for substantial capital to

develop the APDO Assets in the near term.

In parallel with its acquisition of Dial, Henkel explicitly stated its intention of

strengthening its portfolio of brand-name consumer products in North America. The addition of

Right Guard, one of the leading North American brands of men's antiperspirant and deodorant

products, is a natural next step. It provides an excellent fit with Henkel's strategic plans for growth into further segments of the personal care business and for a more balanced regional presence. Henkel's long history and extensive experience with similar products in Europe, coupled with the Dial infrastructure and expertise in North America, provide Henkel the perfect platform for expansion. Henkel is well positioned to maintain and expand the APDO Assets' customer relationships as a strong competitor in the marketplace immediately. Throughout the years of constant growth and expansion, Henkel has proven that, with the necessary intellectual property and innovation, it is capable of successfully entering into new businesses.

## IV.    THE APDO ASSETS

Dial will be acquiring an established business with a proven record of innovative development and application as a supplier of antiperspirants and deodorants.

The APDO Assets include the leading men's antiperspirant and deodorant brand, Right Guard, along with women's brands Soft & Dri, Dry Idea, and non-U.S. brands Balance (Columbia) and Natrel Plus (UK). Right Guard commands the second largest share in the male U.S. antiperspirant/deodorant category in 2004 and has been a major contributor to the development of the category over time. With widespread distribution in the United States, United Kingdom, and Canada, Right Guard has solid channel distribution and strong brand equity, providing significant opportunities for future growth.

In a category in which brand name is very important in the consumer's purchase decision, Right Guard's brand equity is extremely powerful. Right Guard's technological strength, combined with superior product performance, has generated impressive brand equity that is augmented by ongoing investment in world-class advertising. Within the men's antiperspirants/deodorants category, Right Guard is one of the most recognized brands today. Right Guard product offerings cover most significant product forms, including gels, roll-ons,

8

sticks/solids and aerosols. The brand competes at a range of price points and is strongly positioned to effectively participate in the premium-priced segment, the fastest-growing segment within the category. Right Guard has some of the most clinically efficacious products in the male antiperspirants/deodorants category and is sold in all major trade channels. The premium-priced Xtreme sub-brand and the mid-priced Sport sub-brand leverage the equity of the overall Right Guard umbrella and differentiate themselves via distinctive technology.

The Soft & Dri and Dry Idea female brands enjoy high levels of consumer awareness and strong distribution in the United States, Canada, and select Latin American countries. Both brands utilize several of the formulations and innovations featured in Right Guard and serve as female complements to Right Guard in merchandising and promotional activities. Given their ability to add manufacturing and promotional scale, and the limited investment required to support the brands, Soft & Dri and Dry Idea are efficient contributors to the portfolio's top- and bottom-lines.

Antiperspirants and deodorants are considered necessary personal care purchases by 92 percent of teenagers and adults in North America and the United Kingdom. Driven by this near-universal penetration in developed regions, the category delivers stable and predictable unit growth. Globally, sales of antiperspirants and deodorants are estimated at $10.5 billion and are projected to grow at an annual rate of 3.1 percent over the next five years, driven primarily by increased product use in various developing locales and by changing consumer demand. In particular, increased consumer willingness to pay more for new products that deliver value-added benefits (such as fragrance or innovative packaging) has led to recent dollar value growth in the premium-priced segment of the category. Success in this increasingly important segment is driven by three main factors: brand strength, clinically tested and/or perceived product efficacy and overall consumer satisfaction.

9

Given its strong brand presence and loyal customer base, Right Guard is well positioned to capitalize on this category growth. Right Guard was the second-most widely used APDO brand marketed towards males in North America on a value basis in 2004, with an approximate 18 percent share. It benefits from strong brand equity, a meaningful asset given the importance that brand name plays in the consumer's antiperspirant/deodorant purchase decision. For over forty years, the distinctive Right Guard logo has been a valuable branding mechanism in the personal care aisles of retailers, mass merchandisers, and drug stores. Right Guard was one of the first deodorant brands and, as such, has helped shape the development of the category over the last four decades. A very impressive history of innovation, best in class technology and a long-standing investment in world-class advertising have helped to further build Right Guard's equity.

The APDO Assets maintain healthy distribution levels with key national and regional retailers. Right Guard is distributed by the nation's top retailers including Wal-Mart, Kmart, Target, CVS, Walgreens, Rite Aid, Brooks, Longs, Safeway, Kroger, and Sam's Club. The brand's vast distribution network, strong history of innovation and effective marketing provide it with strong product placement, shelf-space, and merchandising opportunities. Right Guard products are usually placed at eye-level and benefit from significant shelf facings. Soft & Dri and Dry Idea products are likewise widely distributed in the United States and Canada. Similar to their male counterparts in the portfolio, retailers reward both female brands' strong equity with prominent shelf-positioning.

The APDO Assets have achieved gross margins of [CONFIDENTIAL MATERIAL REDACTED] in recent years. For 2004, gross profits were [CONFIDENTIAL MATERIAL REDACTED] on worldwide net sales of [CONFIDENTIAL MATERIAL REDACTED]. Overall, the APDO Assets experienced [CONFIDENTIAL MATERIAL REDACTED] annual

10

net sales growth from 2002 to 2004. Growth is expected to continue, powered by the
repositioning of the Right Guard brand, which is already in its final stages and ready for the
purchaser to reap the full benefit.

The APDO Assets include the equipment necessary for the production of Right Guard,
Soft & Dri, and Dry Idea, from the manufacturing facility in Andover, Massachusetts as well as
molds located at third-party contract manufacturers (collectively, the "Equipment"). P&G will
also provide transition services to facilitate the removal and transfer of the Equipment to Dial's
facility without disruption to the business, including the transfer of the line that manufactures the
Power Stripe products, which require a unique, specially designed filling process.

Pursuant to paragraph III of the Order to Maintain Assets, P&G has retained an Interim
Monitor to supervise P&G and Gillette's compliance with the divestiture and asset maintenance
obligations and related requirements. The Interim Monitor, Mr. Edward A. Gold of
PricewaterhouseCoopers LLP, was vested with all powers and authorities required to oversee
P&G's maintenance of the APDO Assets.

## V.    THE AGREEMENT

Pursuant to the *Merger Remedies Statement*, the divestiture agreement must convey all
assets required to be divested and must not contain any provisions inconsistent with the terms of
the Commission's order or with the remedial objectives of the order. The *Merger Remedies
Statement* also provides that, in evaluating the terms of the divestiture agreement, the
Commission staff will rely, in large part, on the acquirer.

The Agreement conveys all assets required to be divested and does not contain any
provisions inconsistent with the terms of the Consent Order or its remedial objectives. Pursuant
to the Agreement, Gillette has agreed to sell and Dial has agreed to purchase all rights, title, and

interest to the APDO Assets for the purchase price of [CONFIDENTIAL MATERIAL REDACTED].

As set forth in more detail in the Agreement, the key acquired assets and rights include (as these terms are defined in the Agreement): (i) the Books and Records; (ii) any Contract and Supply Contract; (iii) the APDO Manufacturing Equipment; (iv) the Product Intellectual Property, except the Product Licensed Intellectual Property; (v) a non-exclusive, perpetual, irrevocable, fully paid-up and royalty free license(s) with rights to sublicense to all Product Licensed Intellectual Property; and (vi) any goodwill primarily related to the Business. The raw materials and inventories of the current APDO products will be sold at the end of the TSSA. These assets, including product supply and services that P&G will provide to Dial pursuant to the TSSA, constitute all the assets and services that are necessary for Dial to conduct the APDO business immediately following the closing in all material respects in the same manner as it is currently conducted by Gillette.

The TSSA and the Agreement between P&G and Dial provide, as required by Paragraph II of the Order, that:

- ❑ P&G will provide Dial with the opportunity to enter into employment contracts with the APDO Core Employees during the Access Period, will not interfere with the hiring or employing by Dial of any such employees, and will remove any impediments within the control of P&G that may deter these employees;

- ❑ P&G will provide written notification of the restrictions on the use by P&G's personnel of the Confidential Business Information related to the APDO Products;

- ❑ Upon reasonable notice and request by Dial, P&G will make available to Dial, at no greater than Direct Cost, such additional personnel, assistance and training as Dial might reasonably need for the complete transfer of the APDO Assets;

- ❑ Upon reasonable notice and request from Dial, P&G shall provide, in a timely manner, at no greater than Direct Cost, assistance of knowledgeable employees of P&G to assist Dial to defend against, respond to, or otherwise participate in any litigation related to the Intellectual Property.

12

Thus, the Agreement fully complies with and satisfies the purposes of the Consent Agreement.

## VI.    CONCLUSION

The proposed divestiture of the APDO Assets to Dial and Henkel will accomplish fully the purposes of the Consent Agreement and remedy any alleged increase of concentration in the sale of men's antiperspirant/deodorant products in the United States as a result of P&G's acquisition of Gillette.

Dial and Henkel will be a strong and effective competitor with the financial ability to successfully complete the transaction and invest in the antiperspirant/deodorant business on a going-forward basis. As established and integrated producers and marketers of personal care products, Dial and Henkel have the necessary industry experience, customer relationships, and knowledge of the APDO business to operate the U.S. operations successfully. Furthermore, Dial will be acquiring an established business requiring no additional management expertise. Finally, as a leading company in the manufacture and sale of personal care products, Dial and Henkel have the competitive ability to maintain or restore competition in the marketplace. Accordingly, P&G respectfully requests that the Commission approve the proposed divestiture as soon as possible.

Dated: February 24, 2006

Respectfully submitted,

By: _____
Joe Sims
Montgomery Kosma
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Counsel for The Procter & Gamble Company

14

PUBLIC RECORD VERSION

**Docket No. C-4151**
**File No. 051-0115**

## <u>EXHIBITS ENCLOSED</u>

Exhibit A     Asset Sale and Purchase Agreement Between The Gillette Company and
The Dial Corporation
[CONFIDENTIAL MATERIAL REDACTED]

Exhibit B     Henkel KGaA Annual Report 2005

# Exhibit G



( 1 of 1 )

| United States Patent | 9,707,689 |
|---|---|
| Stiles | July 18, 2017 |

Personal styling razor

## Abstract

A hand-held razor has single or multiple blades of a smaller dimension than is typical and features an ergonomically advantageous handle allow more detailed shaving and hair removal. The increased detail allows shaving of more difficult areas for shaving and allows detailed hair removal for fashionable shaving styles of the beard, goatee, scalp, sideburns or other areas. Embodiments include a shaving head that is an integrated disposable razor or is part of a replaceable razor blade cartridge.

**Inventors:** **Stiles; Sharidan L.** (Redding, CA)

**Applicant:**

| Name | City | State | Country | Type |
|---|---|---|---|---|
| **Stiles; Sharidan L.** | Redding | CA | | US |

**Family ID:** **39099994**
**Appl. No.:** **14/820,343**
**Filed:** **August 6, 2015**

### Prior Publication Data

| Document Identifier | Publication Date |
|---|---|
| US 20150360378 A1 | Dec 17, 2015 |

### Related U.S. Patent Documents

| Application Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|
| 11775688 | Jul 10, 2007 | 9108329 | |
| 10648686 | Aug 25, 2003 | | |
| 10219095 | Aug 13, 2002 | | |

# Exhibit H

2570 Harlan Drive• Redding, California 96003-3479
Phone: (530) 229-1007 • Fax: (530) 229-9007 • Mobile: (530) 339-1933

E-Mail: Sharidan@stilesrazor.com
Web: www.stilesrazor.com

Date: June 11, 2015

Ms. Kathleen Foote
Assistant Attorney General; Department of Justice, Antitrust division
455 Golden Gate Ave #11000
San Francisco, California  94102-3664

Re:  Your Investigation of Walmart and American International Industries/Stiles Razor

Dear Ms. Foote:

I contacted your office initially in September of 2014 regarding my claims against Walmart and American International Industries for violations of the antitrust laws.  When I first contacted you, you told me that I do indeed have a case and you wanted to gather evidence to proceed.  My understanding is that you assigned Mr. Ramirez to work on an investigation of my case.

I now write to obtain an update on that investigation.  Timing is critical because I am now proceeding *pro se* in a civil case, and I am facing a Motion to Dismiss set for hearing on June 24 before Magistrate Judge Kellison in the Eastern District of California, Redding Division.

With your experience, you know more than anyone how crucial it is for me to recover damages.  I've worked tirelessly since 1998 to bring the Stiles Razor to life.  My life's work has been stolen, and I've been boycotted by Walmart and other retailers in violation of the antitrust laws.

Any update you could provide at your earliest possible convenience would be most appreciated.

Sincerely,

*Sharidan I Stils*

Sharidan Stiles

# Exhibit I

No. _____

IN THE
# Supreme Court of the United States

JOHN NYPL,

*Petitioner,*

v.

JPMORGAN CHASE & CO. *et al.,*

*Respondents.*

**On Petition for Writ of Certiorari to the
United States Court of Appeals for the Ninth Circuit**

**PETITION FOR A WRIT OF CERTIORARI**

JOSEPH M. ALIOTO
  *Counsel of Record*
JAMIE MILLER
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
(415) 434-8900
jmalioto@aliotolaw.com

*Counsel for Petitioner*

November 30, 2020

i

## QUESTIONS PRESENTED

Whether this Court should decide an important question of federal law that has not been, but should be, settled by this Court, with regard to the applicable burden on a moving-party seeking to quash the subpoena of a non-party witness under Fed. R. Civ. P. 45(d)(3).

Whether, under Fed. R. Civ. P. 45, the court where subpoena compliance is required must weigh and/or defer to the opinion of the court where the action is pending in ruling on a motion to quash the subpoena of a non-party witness.

ii

## PARTIES TO THE PROCEEDINGS

Petitioners in this Court, Plaintiffs-Appellants below are:

JOHN NYPL, AN INDIVIDUAL; LISA MCCARTHY, AN INDIVIDUAL; MAD TRAVEL, INC. A.K.A. TRAVEL LEADERS; VALARIE JOLLY, AN INDIVIDUAL; GO EVERYWHERE, INC., A CORPORATION; WILLIAM RUBINSOHN DOING BUSINESS AS RUBINSOHN TRAVEL ON BEHALF OF THEMSELVES AND THOSE SIMILARLY SITUATED.

Respondents in this Court are:

Defendants-Appellees

JP MORGAN CHASE & CO; J.P. MORGAN CHASE BANK, N.A.; BANK OF AMERICA CORPORATION; BANK OF AMERICA N.A.; HSBC BANK USA, N.A.; HSBC NORTH AMERICAN HOLDINGS, INC.; CITIGROUP, INC.; CITIBANK, N.A.; CITICORP.; UBS AG, BARCLAYS PLC; BARCLAYS CAPITAL, INC.; ROYAL BANK OF SCOTLAND, PLC; and

Real-Party-In-Interest-Appellee

SIMON FOWLES; and

Movant-Appellee:

Wells Fargo.

## RULE 29.6 CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, no petitioner has a parent company and no publicly held company owns 10% or more of any petitioner's stock.

iii

## RELATED CASES

*Nypl v. JPMorgan Chase & Co.*, Case No., 19-15293 (9th Cir. Apr. 28, 2020).

*Nypl v. JPMorgan Chase & Co.*, Case No., Case No., 3:18-mc-80209-JCS

(N.D. Cal. Jan. 18, 2019).

*Nypl, et al. v. JPMorgan Chase & Co., et al.*, Case No. :15:cv-9300 (S.D.N.Y.

case is pending).

*In re Foreign Exchange Benchmark Rates Antitrust Litigation,* 1:13-cv-07789-

LGS (S.D.N.Y. case is pending).

iv

## **TABLE OF CONTENTS**

QUESTIONS PRESENTED ................................................................................ i

PARTIES TO THE PROCEEDINGS ............................................................... ii

RULE 29.6 CORPORATE DISCLOSURE STATEMENT ............................. ii

RELATED CASES .......................................................................................... iii

TABLE OF AUTHORITIES .......................................................................... vi

REQUESTED RELIEF .................................................................................... 1

OPINIONS BELOW ......................................................................................... 1

JURISDICTION ............................................................................................... 1

STATUTORY PROVISIONS INVOLVED ..................................................... 1

STATEMENT OF THE CASE ......................................................................... 2

REASONS FOR GRANTING THE PETITION ........................................... 12

    I.     THE DECISIONS OF THE UNITED STATES COURT OF
           APPEALS FOR THE NINTH CIRCUIT AND THE LOWER
           COURT SO FAR DEPART FROM THE ACCEPTED AND
           USUAL COURSE OF JUDICIAL PROCEEDINGS AND
           PRESENT AN IMPORTANT QUESTION OF FEDERAL LAW
           REGARDING THE BURDEN ON THE MOVING PARTY ON A
           MOTION TO QUASH THE SUBPOENA OF A THIRD-PARTY
           WITNESS ........................................................................................ 12

         A. The Ninth Circuit and the Lower Court in this Case Refused
             to Give Any Weight to the Decision of the Court Where the
             Action is Pending in Contravention to Fed. R. Civ. P. 45 and
             the Federal Circuit's Decision in *Truswal* .......................................... 16

CONCLUSION ............................................................................................... 18

INDEX TO APPENDICES

Memorandum in the United States Court of Appeals for the Ninth Circuit
    (April 28, 2020) ............................................................................... App. 1

v

Order Denying Plaintiff's Motion for Relief from Magistrate Judge's Non-
Dispositive Pre-Trial Order in the United States District Court for the
Northern District of California San Jose Division
(February 13, 2019) ........................................................................................ App. 6

Minute Order in the United States District Court for the Northern District of
California San Jose Division (January 18, 2019) ........................................... App. 8

Order Denying Rehearing in the United States Court of Appeals for the
Ninth Circuit (July 1, 2020) .......................................................................... App. 9

Transcript of Motion Hearing (January 18, 2019) ........................................... App. 11

vi

# TABLE OF AUTHORITIES

**Cases**

*Mount Hope Church v. Bash Back!,*
705 F.3d 418 (9th Cir. 2012) ................................................................................ 16

*Truswal Systems Corp. v. Hydro-Air Engineering, Inc,*
813 F.2d 1207 (Fed. Cir. 1987) ................................................. 14, 15, 16, 17, 18

*Virginia Dept. of Corrections v. Jordan,*
921 F.3d 180 (4th Cir. 2019) ................................................................................ 12

*Wiwa v. Royal Dutch Petroleum,*
392 F.3d 812 (5th Cir. 2004) ........................................................................ 15, 16

**Statutes**

28 U.S.C. § 1254(1) ................................................................................................... 1

15 U.S.C. § 1 ............................................................................................................. 3

**Rules**

Fed. R. Civ. P. 26(b)(1) ........................................................................................... 17

Fed. R. Civ. P. 34(a) ............................................................................................... 16

Fed. R. Civ. P. 45 ........................................................................................ i, 12, 16, 18

Fed. R. Civ. P. 45(c)(1) ........................................................................................... 16

Fed. R. Civ. P. 45(d)(3) ....................................................................................... i, 12

Fed. R. Civ. P. 45(d)(3)(B)(i)-(ii) ............................................................................ 1

Fed. R. Civ. P. 45(f) ............................................................................................... 18

Fed. R. Civ. P. 72(a) ............................................................................................... 11

1

## REQUESTED RELIEF

Petitioners respectfully pray that a writ of certiorari issue to review the decision of the United States Court of Appeals for the Ninth Circuit in this case, that this Court reverse the decision of the Court of Appeals.

## OPINIONS BELOW

The opinion of the Court of Appeals is Appendix to Petition for Writ of Certiorari ("App." 1-5). The opinions of the district court (App. 7-8 and App. 11-26) are unreported.

## JURISDICTION

The Court of Appeals rendered its decision on April 28, 2020. (App. 1-5). The court denied a timely Petition for Rehearing *En Banc* on July 1, 2020. (App. 9-10). The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

Petitioners now file this Petition for Writ of Certiorari on November 30, 2020.

## STATUTORY PROVISIONS INVOLVED

Fed. R. Civ. P. 45(d)(3)(B)(i)-(ii) provides, in pertinent part, as follows:

To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

2

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

## STATEMENT OF THE CASE

The Underlying Action

The Plaintiffs herein filed the underlying action in the United States District Court for the Northern District of California in May 2015, which was ultimately transferred to the United States District Court for the Southern District of New York in November 2015. That case is *Nypl v. JP Morgan Chase & Co. et al.,* Southern District of New York Case No. 15-cv-9300 (LGS). (See S.D.N.Y. Dkt. Nos. 1 and 53). The operative version of Plaintiffs' Complaint, the Third Amended Complaint ("TAC"), was filed on August 10, 2017. [Dkt. No. 3 at p. 27].

Plaintiffs John Nypl, *et al.* ("Plaintiffs") brought suit on behalf of a nationwide putative class of purchasers and end-users of foreign currency transactions from banks at benchmark exchange rates fixed, rigged, and manipulated by Bank of America Corporation, Bank of America, N.A. (collectively "Bank of America"), JP Morgan Chase & Co, J.P. Morgan Bank, N.A., JP Morgan Chase Bank, N.A., (collectively "Chase"), HSBC Bank USA, N.A., HSBC North American Holdings (collectively "HSBC"), Citigroup, Inc., Citicorp, Citibank, N.A., (collectively "Citibank"), UBS AG ("UBS"), Barclays PLC, Barclays Capital, Inc., (collectively "Barclays"), Royal Bank of Scotland, PLC ("RBS"), and other unnamed

3

co-conspirators, pursuant to a conspiracy, combination and agreement to fix, rig and manipulate foreign currency benchmark exchange rates in violation of section 1 of the Sherman Act (15 U.S.C. § 1). [Dkt. No. 3 at p. 27; TAC at p. 1]. The *Nypl* Plaintiffs seek injunctive relief and monetary damages, including treble damages, to compensate them for overcharge damages caused by reason of the unlawful conspiracy. (*Id.*).

The TAC references, attaches, and incorporates factual allegations derived from guilty pleas entered into by the defendant banks and other documents. [Dkt. No. 3 at pp. 39-42, 58-138; TAC, ¶¶ 43- 56]. The unlawful conduct described in the TAC and its attachments allege that between December 2007 and January 2013, euro-dollar traders at defendant banks and other unnamed co-conspirators– self-described members of "The Cartel" – used an exclusive electronic chat room and coded language to manipulate benchmark exchange rates. [Dkt. No. 3 at pp. 37, 60-61, 63-64, 89-95, 110, 127-128]. Those rates are set through, among other ways, two major daily "fixes," the 2:15 p.m. European Central Bank fix and the 4:00 p.m. World Markets/Reuters fix. [Dkt. No. 3 at p. 41, 63-64, 89-91, 125-127]. Third parties collect trading data at these times to calculate and publish a daily "fix rate," which in turn is used to price orders for many large customers. *Id.* "The Cartel" traders coordinated their trading of U.S. dollars and euros to manipulate the benchmark rates set at the 2:15 p.m. and 4:00 p.m. fixes in an effort to increase their profits. *Id.* The traders also used their electronic chats to manipulate the

4

euro-dollar exchange rate in other ways. Members of "The Cartel" manipulated the euro-dollar exchange rate by agreeing to withhold bids or offers for euros or dollars to avoid moving the exchange rate in a direction adverse to open positions held by co-conspirators. *Id.* By agreeing not to buy or sell at certain times, the traders protected each other's trading positions by withholding supply of or demand for currency and suppressing competition in the FX market. *Id.*

While the TAC identifies specific defendant banks, it further alleges that, "various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Plaintiffs may seek leave to amend this complaint to add the co-conspirators, known and unknown as Defendants." [Dkt. No. 3 at p. 37; TAC, ¶ 37].

Fowles' Complaint

On April 11, 2018, Appellee Simon Fowles filed a Complaint against Wells Fargo Bank in San Francisco Superior Court, which was removed to the Northern District of California and then later remanded to Superior Court. [Dkt. No. 3 at pp. 140- 152]. Fowles' Complaint alleges, *inter alia*:

> Simon Fowles [the subpoenaed deponent] joined ... Wells Fargo, Inc ... in April 1996 as a Senior Foreign Exchange (FX)Trader. In 1998 he was promoted to Head of FX Trading in San Francisco. During [Mr. Fowles] twenty-one year and seven-month tenure with Wells Fargo, he was promoted to Executive Vice President, managed a global team of up to 65 traders, and was part of the FX senior management team.

***

5

> Plaintiff had made repeated, strident, clear and unambiguous complaints to many members of the Well[s] Fargo's upper level management team about the significant risks of illegal activity, mail and wire fraud, unlawful profiteering, and regulatory violations that would inevitably and certainly result from the compensation plan used by Wells Fargo to compensate members of the FX Sales and Trading Teams.

[Dkt. No. 3 at pp. 140-141; Fowles Complaint, ¶¶ 1, 3]. Fowles continued to allege

that:

> In mid-September of 2017, [Fowles] made it very clear to upper management that he intended to inform federal regulators of the significant ethical, legal, and regulatory issues he had noted and been complaining about concerning the FX Sales teams' use of the cash-based incentive program..."

[Dkt. No. 3 at pp. 146-147].

Mr. Fowles was terminated by Wells Fargo Bank, along with other FX executives on October 16, 2017.  [Dkt. No. 3 at pp. 141 and 146-148, Fowles Complaint, ¶¶ 2, and 24-26].

The First Subpoena

When Plaintiffs discovered the Fowles Complaint, Plaintiffs' counsel made multiple meet and confer telephone calls to Mr. Fowles' attorney, Daniel Feder, receiving assurances from Mr. Feder's secretary that Mr. Feder would return the telephone calls, but he never did. [Dkt. No. 11 at p. 2; Winters Decl. ¶ 4].  As a result, on October 12, 2018, Plaintiffs were obliged to serve Mr. Fowles with a subpoena at his residence in Petaluma, California, near San Francisco with notice to all Defendants for the taking of Mr. Fowles' deposition on November 28, 2018 at

6

10:00 a.m. at the Offices of *Nypl* Plaintiffs' counsel in San Francisco, California. [Dkt. No. 11 at pp. 2 and 6-19; Winters Decl. ¶ 4 and Exhibit A].

The subpoena at issue sought testimony and documents from whistleblower Simon Fowles, a resident of the Northern District of California, and the former Head of FX ("foreign currency") trading at Wells Fargo Bank, N.A. The subpoena sought the following information from Mr. Fowles:

Schedule A. Topics of Deposition - Topic No. 1: "The reasons given by Mr. Simon Fowles in support of his complaint filed on April 11, 2018."

Schedule B. Requests for Documents and Things - Request No. 1 - "any and all documents, things, communications, and information that support his allegations, including notes, memoranda, or other documents."

[Dkt. No. 11 at pp. 16-17].

The Southern District of New York Compelled the Deposition of Mr. Fowles and then Rescinded Its Order Because the New York Court Believed it Did not Have Jurisdiction to Compel Mr. Fowles' Deposition in California

October 22, 2018, Mr. Feder sent Plaintiffs' counsel an e-mail objecting to the Subpoena, claiming that, Fowles has no knowledge of the cartel chatroom and that "Plaintiff has no knowledge, documentation, communications, information, etc., that relates to FX benchmark rate fixing within the FX market." [Dkt. No. 11 at p. 23; Winters Decl., Exhibit B, at p. 3]. On October 24, 2018, Mr. Feder served Plaintiffs' counsel an Objection to the Subpoena to Simon Fowles, containing, for the most part, boilerplate objections. [Dkt. No. 11 at pp. 26-28; Winters Decl. Exhibit C]. Mr.

7

Fowles' Objection did not contain a declaration or sworn affidavit, and no such document from Mr. Fowles exists in the record.

In the face of Fowles' objection, on November 13, 2018, Plaintiffs' counsel filed and serve a pre-conference motion in the underlying action to enforce the subpoena seeking testimony and documents from Mr. Fowles. [Dkt. No. 11 at pp. 30- 35; Winters Decl., Exhibit D]. On November 14, 2018, the Court entered an order requiring Plaintiffs to submit a declaration with the facts outlined in its pre-conference motion.   [Dkt. No. 11 at p. 40; Winters Decl. Exhibit E].   In that declaration, Plaintiffs established that:

> Discovery in the *Nypl* action has revealed hundreds of pages of documents that show that Wells Fargo Bank per Thomas Kiefer was an active participant in the FX chat rooms with competitor banks in which the manipulation and price-fixing of foreign exchange rates took place. (A sample of some of the beginning Bates numbers for these documents are RBS_NYPL,0030046 etc., RBS_NYPL-0030099 etc., RBS_NYPL-0031417 etc.).

[Dkt. No. 11 at p. 4; Winters Decl. ¶ 8].

On November 19, 2018, counsel for Mr. Fowles, Daniel Feder filed a letter on behalf of Mr. Fowles claiming Fowles has no personal knowledge related to the Plaintiffs' claims. [S.D.N.Y. Dkt. No. 374]. Notwithstanding Mr. Fowles' claims, on November 20, 2018, the New York Court issued an order granting Plaintiffs' Motion to Compel the deposition of Fowles and further ordered Mr. Fowles to produce the documents requested in Schedule B of the Subpoena. [Dkt. No. 3 at p. 154]. The Court ordered Mr. Fowles to submit a letter with his objections, including any

8

claims of privilege, to the deposition or subpoena duces tecum on or before November 23, 2018. *Id.*

Instead, on November 23, 2018, Wells Fargo, not Fowles, filed a letter objection. In that objection, Wells Fargo contended that, "the Federal Rules do not authorize this Court to compel compliance in another federal judicial district." [Dkt. No. 3 at p. 157]. Wells Fargo also claimed that the information sought was not relevant to the proceedings and purportedly implicated sensitive and confidential information of Wells Fargo. [Dkt. No. 3 at pp. 158-159].

On November 26, 2018, Judge Schofield of the Southern District of New York, apparently persuaded by Wells Fargo's arguments, rescinded her November 20, 2018, Order, because, "In this case, the appropriate district to bring a motion to compel is the Northern District of California." [Dkt. No. 3 at p. 162]. The November 20 Order was not rescinded on the basis that the Subpoena sought irrelevant information.

The Second Subpoena

On November 27, 2018, the *Nypl* Plaintiffs served a second subpoena on Simon Fowles setting his deposition at *Nypl* Plaintiffs' counsel's office in San Francisco, California, within 100 miles of his residence in Petaluma, California, at 10:00 a.m. on December 19, 2018, with Notice thereof served on all *Nypl* Defendants. The Subpoena listed the following deposition topics and requested the following documents:

9

Schedule A. Topics of Deposition-Topic No. 1: The reasons given by Mr. Simon Fowles in support of his complaint filed on April 11, 2018.

Schedule B. Requests for Documents and Things - Request No. 1 - "any and all documents, things, communications, and information that support his allegations, including notes, memoranda, or other documents."

[Dkt. No. 11 at pp. 58-70].

Appellees' Motion to Quash and Plaintiffs' Motion to Compel

On November 28, 2018, Wells Fargo, joined by Fowles, filed a Motion to Quash the Subpoena in the United States District Court for the Northern District of California, Case No. 18-mc-80209-JCS. [Dkt. No. 1 at pp. 1-13; Dkt. No. 2 at pp. 1-3; Dkt. No. 3 at pp. 1-175]. On December 5, 2018, the *Nypl* Plaintiffs filed an Opposition to the Motion to Quash and a Motion to Compel the deposition of Fowles and the production of the requested documents. [Dkt. No. 6 at pp. 1-10; Dkt. No. 11 at pp. 1-70]. On December 17, 2018, Fowles joined in Wells Fargo's Opposition to Plaintiffs' Motion to Compel and in Wells Fargo's Motion to Quash. [Dkt. No. 15]. On December 19, 2018, Wells Fargo filed its Opposition to Plaintiffs' Motion to Compel and its Reply in Support of its Motion to Quash. [Dkt. Nos. 17 and 18]. On December 21, 2018, Plaintiffs filed a Reply Brief in Support of their Motion to Compel. [Dkt. No. 18 at pp. 1-5].

10

## The Ruling of the Magistrate Judge

A hearing was held before Magistrate Judge Joseph C. Spero on January 18,

2019. [App. 11-27; 1/28/19 Hrg. Tr.]. Magistrate Judge Spero granted the Motion to

Quash and made no reference to Plaintiffs' Motion to Compel, holding that:

> The subpoena issue is very simple in scope. It seeks topics -- it seeks to
> have a deposition of Mr. Fowles about the – a basis for his allegations
> in his April 11th, 2011 wrongful termination complaint against the
> bank and documents that support those allegations.
>
> The topic of the Southern District action, the Nypl action, is a claim of
> price fixing in the benchmark exchange rates for foreign currency, the
> FX benchmarks. The allegation is that the conspirators coordinated
> their trades in connection with the two daily fixes and another action
> in connection with the two daily fixes like withholding bids in order to
> manipulate that price. The topic of the Fowles complaint has nothing
> to do with that. The topic of the Fowles complaint is wrongful
> termination and retaliation for opposing alleged illegal conduct by the
> bank.
>
> The allegation is that the compensation plan for the foreign exchange
> sales persons -- can't remember exactly what they were called, but --
> was based on revenue which would result in significant risk of illegal
> conduct such as not adhering to a customer's spread agreement or
> overcharging the client of the bank on FX transactions, illegally
> increasing the spreads, and customers at year-end to -- so they can
> make their numbers, and the Department of Justice has been asking
> questions about one particular transaction, whether it generated
> revenue for the bank that should have been shared with the customers.
> The allegations of that complaint do not concern price fixing of the
> benchmark rate for foreign exchange currency. Period.
>
> The unlawful conduct that's referred in the Fowles' complaint is
> unrelated to that -- that matter of the benchmark price and is not
> related to a price-fixing conspiracy.
>
> The fact that -- just as an aside -- that another employee other than
> Mr. Fowles -- I think his name is Keefer (ph) -- participated in the chat
> room where non -- employees of other banks engaged in price fixing,

11

not this particular bank – Wells Fargo -- it does not make the
deposition or the documents relevant. First of all, it's not Mr. Fowles
and it's not a topic of Mr. Fowles' complaint, more particularly, which
is all you have subpoenaed. And there's no connection between Mr.
Fowles and the chat room and, you know, we're not here to discuss
whether Mr. Keefer can be deposed, but there's not even an effort to
show that what Mr. Keefer did in the chat room had anything to do
with illegal activity.

\*\*\*

All right. Tentative is confirmed. Motion is granted. <u>The subpoena is
quashed</u>.

[App. 14:10-5:25 and 23:21-22] [emphasis added].

<u>Objection to the Magistrate Judge's Ruling</u>

On February 1, 2019, pursuant to Fed. R. Civ. P. 72(a) and Civil Local Rule

72-2, the *Nypl* Plaintiffs filed a Motion for Relief from Non-Dispositive Pretrial

Order of a Magistrate Judge.  [Dkt. Nos. 23; 23-1; 23-2; 23-3].  On February 13,

2019, that Motion was denied by District Judge Beth Labson Freeman on the

following grounds:

> Judge Spero noted that "[t]he topic of the Fowles complaint has
> nothing to do with [Plaintiff's action]." *See* Hearing Transcript at 4:21–
> 22. Judge Spero thoroughly explained how and why the respective
> actions are different. *See id.* at 4:15–5:13. Judge Spero therefore
> reasoned that deposition of Simon Fowles was not warranted because
> "[t]he allegations of [the Fowles] complaint do not concern [the
> allegations of Plaintiff's complaint]." *See id.* at 5:9–10. In other words,
> Judge Spero found that "just because [Fowles is] involved in the
> exchange rate business and he blew the whistle on Wells Fargo with
> respect to an aspect of the exchange rate business [has nothing] to do
> with price fixing [as alleged by Plaintiff]." *See id.* at 7:19–23. This
> Court agrees with Judge Spero's conclusion that Plaintiff's counsel did
> not demonstrate the relevance of the Fowles deposition and show that
> it was more than a fishing expedition. *See id.* at 14:19–15:4.

12

[App. 6-7].

On February 15, 2019, Plaintiffs filed a Notice of Appeal. [Dkt. No. 25].

On April 28, 2020, the Ninth Circuit affirmed the decision of the lower court.

[App. 1-15]. The Ninth Circuit denied Plaintiffs' Petition for rehearing on July 1,

2020. [App. 9].

## REASONS FOR GRANTING THE PETITION

**I.    THE DECISIONS OF THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT AND THE LOWER COURT SO FAR DEPART FROM THE ACCEPTED AND USUAL COURSE OF JUDICIAL PROCEEDINGS AND PRESENT AN IMPORTANT QUESTION OF FEDERAL LAW REGARDING THE BURDEN ON THE MOVING PARTY ON A MOTION TO QUASH THE SUBPOENA OF A THIRD-PARTY WITNESS**

The primary basis for the Respondents' Motion to Quash was that it posed

an "undue burden" because the subpoena sought information irrelevant to the

underlying proceedings. [Dkt. No. 1 at p. 9]. Under Fed R. Civ. P. 45, on a

motion to quash, the moving party bears the burdens of proof and persuasion, not

the requesting party.[1]    *See* Fed. R. Civ P. 45(d)(3) and *Virginia Dept. of*

*Corrections v. Jordan*, 921 F.3d 180, fn.2. (4th Cir. 2019) ("We do not mean to

imply that, on a motion to quash, the requesting party bears the burdens of proof

and of persuasion. **The moving party bears those burdens**." emphasis added.)

At the hearing, the lower court turned that burden on its head:

---

[1] At the hearing, the lower court ruled only on the Motion to Quash filed by Wells Fargo and joined by Fowles. [App. 14:10-0015:25 and 23:21-22; Tr. p. 4:10-5:25 and 13:21-22]. It never explicitly ruled on Plaintiffs' pending Motion to Compel.

13

ALIOTO: Well, they've done none of that, so Your Honor has nothing in front of the Court by them except their lawyer's argument – no affidavit, no disclaimer, no document, no document offered.

THE COURT: Well, of course the burden's on you, not them.

MR. ALIOTO: The burden on me is to ask for discovery.

THE COURT: No.

MR. ALIOTO: And –

THE COURT: That's not -- that's not the burden. The burden is cause. You have to tell me why this is relevant and not overburdensome and just a fishing expedition with respect to a non-party. That's your burden.

MR. ALIOTO: A fishing expedition, Your Honor?

THE COURT: Uh-huh.

[App. 24:10-25:4; (1/18/19) Hrg. Tr. 14:10-15:4].

Rule 45(d)(3) authorizes parties and non-parties to file "timely" motions to quash subpoenas that "subject[] a person to an undue burden." Below, the Petitioners argued that the subpoena presented an undue burden because it requested information irrelevant to the underlying action. [Dkt. No. 1 at p. 10]. By claiming that a subpoena subjects a person to an undue burden because it seeks irrelevant information, a moving party cannot shift its burden to the requesting party. Yet, that is precisely the approach the Ninth Circuit sanctioned here. The lower court conducted an erroneous relevance analysis and stopped the inquiry there. Rather, the lower court should have employed a balancing test to determine, as a whole, whether the subpoena of Fowles was unduly burdensome.

14

The Federal Circuit case, *Truswal Systems Corp. v. Hydro-Air Engineering, Inc*, 813 F.2d 1207 (Fed. Cir. 1987) conflicts with the Ninth Circuit's decision. In *Truswal*, Hydro-Air, a non-party, moved to quash a subpoena served on it by the plaintiff Truswal under Rule 45, on similar grounds to those here, that "the information sought is not reasonably calculated to lead to the discovery of admissible evidence in the pending litigation, and that the discovery of such information would be unreasonable, unduly oppressive and burdensome." *Id.* at 1208. The *Truswal* court explained that in moving to quash, Hydro-Air, "thus undertook the burden of showing that the subpoena is unreasonable and oppressive. 'The burden is particularly heavy to support a 'motion to quash as contrasted to some more limited protection. (citations omitted.)'" *Id.* at 1210. *Truswal* articulated a balancing test on a motion to quash as follows: "The district court must balance 'the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena.' *Heat & Control, Inc.,* 785 F.2d at 1024, 228 USPQ at 931 (citing *Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556, 560, 564 (7th Cir.1984)); 5A *Moore's Federal Practice,* ¶ 45.05[3], at 45–44." The court in *Truswal* reversed the lower court's ruling quashing the subpoena, explaining that:

> Nothing in the order indicates that any balancing was done between relevancy of and Truswal's need for the information sought, on the one hand, and Hydro-Air's potential hardship on the other hand. Nor did the district court say whether it considered the subpoena "unreasonable or oppressive." Fed.R.Civ.P. 45(b)(1). Nor did the district court refer to payment of costs. Fed.R.Civ.P. 45(b)(2). Nor did

15

the district court articulate any of the concerns expressed in Rule 26(b)(1)(i), (ii), or (iii). Nor does the order refer at any point to the potential for use of a protective order under Rule 26(c).

*Id.* at 1211. Similarly, here no balancing test was ever undertaken before the lower court quashed the subpoena. Further, just as in *Truswal*, the lower court did not say that it considered Plaintiffs' Subpoena to be unduly burdensome or point to a potential use of a protective order. Instead, the lower court required Plaintiffs to establish that the Subpoena was not a "fishing expedition" while, at the same time, holding that the Respondents were not required to submit any affidavits or evidence whatsoever averring that they did not possess information relevant to the claims in Plaintiffs' TAC. The analysis undertaken by the court in this case conflicts with *Truswal.*

The Fifth Circuit in *Wiwa v. Royal Dutch Petroleum*, 392 F.3d 812, 818 (5th Cir. 2004) has adopted a similar standard to that of *Truswal*:

> The moving party has the burden of proof to demonstrate "that compliance with the subpoena would be 'unreasonable and oppressive.' " "Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case,' such as the party's need for the documents and the nature and importance of the litigation." To determine whether the subpoena presents an undue burden, we consider the following factors: (1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed.

The analysis set forth in *Wiwa* was never undertaken by either court in this case.

16

Further, the recent Ninth Circuit case, *Mount Hope Church v. Bash Back!*, 705 F.3d 418 (9th Cir. 2012) also conflicts with the approach undertaken by the Court in this case. In *Mount Hope Church*, the Ninth Circuit analyzed the undue burden sanction provisions contained within Fed. R. Civ. P. 45(c)(1). In conducting that analysis, the Ninth Circuit noted that the test it was employing was similar to that used by, "[s]ome courts…to determine whether an undue burden exists, usually in the context of modifying or quashing a subpoena under Rule 45(c)(3)'s identical 'undue burden' language. *Wiwa v. Royal Dutch Petroleum Co.,* 392 F.3d 812, 818 (5th Cir.2004); *Precourt v. Fairbank Reconstruction Corp.,* 280 F.R.D. 462, 467 (D.S.D.2011) (citations omitted)." *Id.* at 425, fn.8. In analyzing identical undue burden language in Rule 45, the Ninth Circuit implemented a test "similar" to that of *Wiwa.* Thus, the Ninth Circuit's holding in *Mount Hope* suggests that it should have, but did not, adopt an analysis similar to that of *Wiwa*—an analysis that was not undertaken by the lower court in this case. Thus, the Ninth Circuit's decision in this case conflicts with its own authority.

> **A.**  **The Ninth Circuit and the Lower Court in this Case Refused to Give Any Weight to the Decision of the Court Where the Action is Pending in Contravention to Fed. R. Civ. P. 45 and the Federal Circuit's Decision in *Truswal***

The scope of the discovery that can be requested through a subpoena under Rule 45 is the same as the scope under Rule 26(b). Fed. R. Civ. P. 45 Advisory Comm.'s Note (1970) ("[T]he scope of discovery through a subpoena is the same as that applicable to Rule 34 and other discovery rules."); Fed. R. Civ. P. 34(a) ("A

17

party may serve on any other party a request within the scope of Rule 26(b).").  Rule 26(b) allows a party to obtain discovery concerning any nonprivileged matter that is relevant to any party's claim or defense and that is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Even though a "district court whose only connection with a case is supervision of discovery ancillary to an action in another district should be 'especially hesitant to pass judgment on what constitutes relevant evidence thereunder, (citations omitted)'" here, the lower court expressed no such hesitance. *Truswal Systems*, 813 F.2d at 1211–12. "Where relevance is in doubt ... the court should be permissive." *Id.* This is especially so under the circumstances here where the District Judge in the underlying action previously compelled the deposition and production of documents but rescinded that order on the grounds that it lacked the authority to issue that order.  The lower court judge acknowledged that Judge Schofield, the District Judge overseeing the consolidated benchmark exchange rate price fixing cases in the Southern District of New York, found Plaintiffs' Subpoena to seek relevant testimony and documents but rescinded her order for other reasons:

> THE COURT: Well, I don't know that. That's not entirely correct. If she [Judge Schofield] thought it was irrelevant, they wouldn't have

18

issued the first order so, you know, this is an excellent judge in New York. She doesn't do things without thinking about them. She obviously thought about it and knows this is a nonparty and thought it was relevant. And she may have been persuaded afterwards that someone else should make that decision, and I respect that.

[App. 26:5-12; (1/18/19) Hrg. Tr. at p. 16:5-12]. Thus, even though the lower court acknowledged that Judge Schofield found the Subpoena to seek testimony relevant to the *Nypl* Plaintiffs' claims, the lower court gave the determination of the District Judge overseeing the antitrust conspiracy proceedings no weight.[2] This decision conflicts with Fed. R. Civ. P. 45 and *Truswal*.

## CONCLUSION

Petitioners respectfully pray that a writ of certiorari issue to review the decision of the United States Court of Appeals for the Ninth Circuit in this case, reverse and remand, and order the deponent to comply with the subpoena.

Respectfully submitted,

JOSEPH M. ALIOTO
  *Counsel of Record*
JAMIE MILLER
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
(415) 434-8900
jmalioto@aliotolaw.com

*Counsel for Petitioner*

---

[2] As an alternative, the lower court could have transferred the motion back to the Southern District of New York under Fed. R. Civ. P. 45(f).

# Exhibit J


**Razor Company**

2570 Harlan Drive Redding, California, USA
Phone (530) 229-1007 • Fax (530) 229-9007
Websiite: http://www.stilesrazor.com
Email: sharidan@stilesrazor.com

*Fax Cover Sheet*

| Send to: | Kai Razor Co., Ltd. | From: | Sharidan Stiles |
|---|---|---|---|
| Attention: | Mr. Kato | Fax number | (530) 229-9007 |
| CC: | | Date: | May 13, 2005 |
| Fax number: | +(575) 28-6911 | Phone number: | (530) 229-1007 |

| URGENT | ✗ REPLY ASAP | PLEASE COMMENT | PLEASE REVIEW | FOR YOUR INFORMATION |
|---|---|---|---|---|

*Total pages, including cover:* 4

Dear Mr. Kato,

Allow me to introduce my-self; my name is Ms. Sharidan Stiles. We at Stiles Razor make specialty razors. I was referred to you from your Oregon office. We are requesting a sample of your finest quality razor blade to be sent to us for testing. It is my understanding that you have an excellent blade as well as the manufacturing capability that we require. We will be manufacturing a single blade razor. We are interested in Kai to manufacture our specialty razor.

Following is our non-disclosure agreement. Please sign and return via fax to Stiles. Our address is above.

If all goes well as anticipated, I will immediately forward over the design & packaging specifications.

Thank you,

Sharidan Stiles

# Exhibit K



Delete    Reply    Reply All    Forward    Move    Junk ▾    Unread    Categorize    Follow Up

## Re: <no subject>

kato-shigeaki@kai-group.com

Sent:  Monday, June 6, 2005 at 3:06 PM

To:  Sharidan Stiles

Cc:  kato-shigeaki@kai-group.com

📎 C.htm (1.2 KB)    Preview

Dear Sharidan-san

Sorry for my delayed action. I will proceed to next step soon.
Please wait for a while.

Best regards / Shigeaki Kato, Kai Corp.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Shigeaki KATO, Mr., Manager, International Div.
Kai Corporation, Japan
TEL: +81-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 / FAX: +81-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
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> From : Sharidan Stiles <sharidan@stilesrazor.com>
> To : <kato-shigeaki@kai-group.com>
> Subject : <no subject>
> Date : 2005/06/03 12:26:01
>
> Dear Mr. Kato Shigeaki,
>
> I am looking forward to receive a sample of your finest blade. I would
> appreciate it if you would forward back the non-disclosure agreement via
> fax
> so we may proceed further, and other company information you think
> necessary. If you are to busy to work with us please refer someone else.
>
> Regards,
>
> Sharidan Stiles
> CEO/President
> Stiles Razor
> 2570 Harlan Drive
> Redding, California  96003
> USA
> Telephone: (530) 229-1007
> Facsimile: (530) 229-9007

Exhibit L

With no explanation,                    Stiles is <u>outperforming</u> its category items by 17%, but "predicts" that it will underperform by 38% in the future. (WM-STILES-0001956)

**Stiles Brow Razors Performance Comparison**

| Topline Summary | Current Mod | Wk 49 Mod |
|---|---|---|
| Category Benchmark | 4.5 | 4.5 |
| % of Items Meeting BM | 0.0% | 0.0% |
| Avg BM of Top 80% of Brow items | 2.20 | 2.02 |

| Current Mod Productivity | ALL BROW ITEMS | LIKE ITEMS | STILES |
|---|---|---|---|
| USW | 0.48 | 0.42 | 0.47 |
| SSW | $1.43 | $1.37 | $1.35 |
| CC | 1.91 | 1.79 | 1.82 |

| Projected Wk 49 Mod Productivity | ALL BROW ITEMS | LIKE ITEMS | STILES |
|---|---|---|---|
| USW | 0.41 | 0.24 | 0.14 |
| SSW | $1.36 | $1.01 | $1.11 |
| CC | 1.77 | 1.25 | 1.25 |

**OBSERVATIONS**

1 Zero Percent of the Brow items are Performing at the Category Benchmark of 4.5

2 In the Current Modular, Stiles is out performing the Average Benchmark of the top 80% of items by 17%.

3 In the Wk 49 Modular, Stiles is projected to under perform the Average Benchmark of the top 80% of items by 38%.

Exhibit M

From: PROCTER & GAMBLE INDL COML LTD -
Sent: Tuesday, October 11, 2011 3:55 PM
To:
Cc: PROCTER & GAMBLE INDL COML LTD -
Subject: RE: 2008 Data


        ‾ had us run that information prior to line reviews.  Attached is the


data from that request.

              ⅰ  |  Category Development Manager - Wet and Dry Shave   |
        ‾t Global Customer Team  |      -571-5413 Office  |    ‾i-619-7775 Cell

 *All Pricing, Promotion, Distribution and Shelving decisions are at the
sole discretion of the retailer.  This electronic message transmission
contains information which may be confidential.  The information is
intended for the use of the individual or entity named above.  If you are
not the intended recipient and have received this electronic transmission
in error, please notify sender then delete immediately.

From:              ‾ y [?mailto:              /@wal-mart.com]
Sent:: Tuesday. October 11, 2011 3:46 PM
To:
Subject: 2008 Data

Do you have access to data from 2008? I need to do an analysis on vendor
Stiles Razors, vendor #205164..
What were their u/s/w vs average category?
Give me a call.

Thanks.

Xar      ‾y
Planner  - Shave
  S-277-9995 Work
  ‾-366-9089 Mobile

 ⅰ              . Inc.
      ‾th street
                      16

# Exhibit N



# INVOICE

Invoice #: 40533
Invoice Date: 03/16/2020
Terms: Net 30
Due Date: 04/15/2020

**Bill To:**

**Pierce Bainbridge Beck Price & Hecht LLP**
**ATTN: Dan Terzian**
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90017
United States

**NEW REMIT PAYMENT TO ADDRESS:**
**Intelligent Management Solutions LLC**
P.O. Box 208312
Dallas, TX 75320-8312

**Project:** Sheridan Stiles, Stiles 4 U, Inc. v. Wal-Mart Stores, Inc., et al. - 2      **Expert Name:** Donald House, Ph.D.

**IMS Job #:** 15737 J 6445 P

Client Manager: Neil Hoyt

| Date(s) | Description | Qty | Unit | Rate | Amount |
|---|---|---|---|---|---|
| 02/24/20 - 02/29/20 | Donald House Sr – All Work and Travel: Reviewed Stiles-Walmart complaint, related RRC files<br>Read Esther Gifford 306b deposition<br>Read Heather Ronchetto deposition, related exhibits<br>Read Melanie Jones deposition, related exhibits<br>Begin expert report construction, review depositions<br>Read Sherry Davis deposition, related exhibits | 26.5 | Hours | $780.00 | $20,670.00 |
| 02/21/20 - 02/29/20 | Donald House Jr Consulting: Review of Stiles v Walmart complaint and initial research<br>Research of antitrust market foreclosure elements<br>Expansion of case study analysis, market foreclosure<br>Deposition review with exhibits<br>Office conference on depos and development<br>Collating and expanding reserch needs, market foreclosure analysis | 30.5 | Hours | $495.00 | $15,097.50 |
| 02/21/20 - 02/27/20 | Blaine Buenger consulting: Review documents (FTC complaints).<br>Download and review documents (depositions). Research online information. Discuss with staff.<br>Review documents (depositions).<br>Review documents (depositions). Research online information. Discuss with staff.<br>Review documents (depositions). Communicate findings to staff.<br>Prepare work summary | 13.5 | Hours | $435.00 | $5,872.50 |
| 02/24/20 | Mary Franer Consulting: Logged in documents received on 2-21-20 and 2-23-20 from Jonathan Wiggins and Dan Terzian for Dr. House, Sr. | .75 | Hours | $170.00 | $127.50 |
| | | | **TOTAL** | | **$41,767.50** |

---

**Contact Us:**
Toll Free (877) 838-8464
invoices@expertservices.com

**New ACH Payment Information:**
Wells Fargo Bank FEI 82-3398725
Acct Name: Intelligent Management Solutions, LLC
Acct No. 2940363969
ACH: Use Routing (ABA) No. 063107513

---

# Exhibit O

